UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
West Palm Beach Division
www.flsb.uscourts.gov

In re:                                              Case No. 21-15555 -EPK

PALM BEACH RESORT AND BEACH CLUB          Chapter 11
CONDOMINIUM ASSOCIATION, INC.,

     Debtor-in-Possession.

_____/

**MOTION FOR ENTRY OF ORDER (A) AUTHORIZING THE PRIVATE SALE OF REAL PROPERTIES AND ANY AND ALL ASSETS LOCATED THEREIN, PURSUANT TO 11 U.S.C. § 363, FREE AND CLEAR OF ALL LIENS, CLAIMS, AND ENCUMBRANCES; (B) AUTHORIZING EXECUTION OF ANY AND ALL DOCUMENTS TO EFFECTUATE CLOSING OF THE SALE; (C) AUTHORIZING PAYMENT OF ALL EXPENSES, FEES AND COSTS ASSOCIATED WITH THE SALE AND ANY OUTSTANDING LIABILITIES OF THE DEBTOR INCURRED POST CONFIRMATION THROUGH CLOSING DATE; AND (D) APPROVING DISTRIBUTION PROCEDURE FOR ALL UNIT-WEEK INTERESTS CO-OWNERS**

     Debtor, Palm Beach Resort and Beach Club Condominium Association, Inc. (the "Debtor"), by counsel, pursuant to 11 U.S.C. §§ 105, and 363, and Bankruptcy Rules 2002(a) and (c)(1), and 6004(a)-(c), and (f), and Local Bankruptcy Rule 6004-1, requests the Court enter an order: (a) authorizing the private sale of all real properties (as detailed herein) free and clear of all liens, claims, and encumbrances; (b) authorizing post-confirmation Debtor to execute any and all documents to effectuate closing of the sale; (c) authorizing payment of all fees and costs associated with the sale and any outstanding liabilities of the Debtor incurred post-confirmation through closing date; and (d) approving distribution procedure for all unit-week interests co-owners (the "Motion").  In support of the Motion, Debtor states as follows:

## JURISDICTION AND VENUE

1.      This Court has jurisdiction over the Motion pursuant to 28 U.S.C. § 1334. This is a core proceeding pursuant to 28 U.S.C. §§ 157(b)(2)(A), (M), (N) and (O).

2.      Venue of this proceeding and the Motion is proper in this district pursuant to 28 U.S.C. § 1409.

3.      The statutory bases for the relief sought herein are sections 363 of chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") and Rules 6004 and 9014 of the Federal Rules of Bankruptcy Procedure.

## BACKGROUND

### The Bankruptcy Case and Confirmed Plan

4.      On June 4, 2021 (the "Petition Date"), the Debtor commenced the Main Proceeding by filing a voluntary petition for relief (the "Petition") under Chapter 11 of the Bankruptcy Code.

5.      On November 10, 2021, the Debtor confirmed its Plan of Liquidation [ECF # 53]. The Order Confirming the Chapter 11 Plan of Liquidation was entered on November 16, 2021 ("Confirmation Order") [ECF # 97].

6.      Between June 4, 2021, through November 16, 2021, the Debtor operated its business and managed its property as a debtor in possession pursuant to Sections 1181 and 1184 of the Bankruptcy Code. At present, the Debtor is operating pursuant to the terms of the Confirmation Order.

7.      The plan as confirmed is premised on the sale of the properties, as detailed herein, to Copperline Partners, LLC (the "Purchaser" or "Copperline"), pursuant to the pre-petition Purchase and Sale Agreement by and between the Debtor and Copperline, as amended, which was assumed pursuant to the terms of the Plan.

**The Debtor, the Properties and Assets to Be Sold**

8.      The Debtor is a condominium association, a Florida not-for-profit corporation, with its principal place of business located in Palm Beach County, Florida. It is organized under the laws of the state of Florida and pursuant to the Florida Condominium Act, Chapter 718, Florida Statutes, and the Florida Timeshare Act, Chapter 721, Florida Statutes, and was formed for the purpose of managing, operating and maintaining the real property known as the Palm Beach Resort and Beach Club Condominium (the "Condominium"), according to Declaration of Condominium of The Palm Beach Resort and Beach Club Condominium, as recorded in Official Records Book 3464, Page 1474 of the Public Records of Palm Beach County, Florida (the "Declaration"), and all amendments thereto.

9.      The Condominium is located at 3031 S. Ocean Blvd., Palm Beach, Florida and consists of one (1) two-story building containing twenty-nine (29) units (collectively, the "Units") and common areas, a swimming pool and patio area, paved driveways, walkways and parking areas, dock facility which are common elements appurtenant thereto.

10.     The Units and all assets located therein are the subject of this Motion. A copy of the legal description of each of the Units to be sold is attached hereto as **Exhibit "A"**.[1]

**The Units: 1508 Tenants in Common Unit-Week Interests**

11.     From 1981 through 2020 (the "Timeshare Period"), the Condominium operated as a vacation timeshare condominium whereby individuals purchased an ownership interest with the right to use certain week intervals in the Condominium ("Owner(s) of Unit Week"), and in exchange for ownership interest and for the right to use the Condominium, each owner was subject to regular assessments to maintain and operate

---

[1] Parties to be served with this Motion will not receive a copy of Exhibit A. A complete copy of **Exhibit A** is available for review at the following address: https://www.eisingerlaw.com/palmbeachresort-bankruptcy/
.

the Condominium (collectively referred to herein as "Interval Ownership"). During the Timeshare Period, each Unit was committed to Interval Ownership. Pursuant to Section 4 of the Declaration, each Unit contained fifty-two (52) Unit Weeks ("Unit Week"), resulting in a total of one thousand five hundred and eight (1,508) Unit Weeks in the Condominium.

12.     One Ownership of Unit Week for each Unit is owned by the Debtor and used for, among other things, maintenance purposes (collectively, the "Maintenance Ownership Interests").

13.     As of the June 4, 2021 (the Debtor's Petition Date, as defined below), the Debtor was a tenant in common owner of 29 Unit Weeks, one week in every Unit, by virtue of the Maintenance Ownership Interests. Additionally, the Debtor regularly forecloses on Owners of Unit Weeks who fail to pay their required assessments fees as required by virtue of their Ownership of Unit Week interests, which results in the Debtor being transferred the delinquent owners' Unit Week interests. As of the Petition Date, the Association was the tenant in common of 48 Unit Weeks in certain Units by virtue of completed administrative foreclosure process.

14.     Based on the Maintenance Ownership Interest and Foreclosed Unit Week Interests, the Association owns a more than 70 Unit Weeks (the "Association Owned Unit Week Interests"). Upon the filing of the Petition, the Association Owned Unit Week Interests became property of the bankruptcy estate pursuant to 11 U.S.C. § 541(a), and the Association is otherwise a tenant in common in each Unit. Section 25.6 of the Declaration provides that in the year 2021, the Owners of Unit Weeks shall become tenants in common and the Board of Directors of the Association shall hold a meeting with the Owners of Unit Weeks to decide the disposition of the Units committed to Interval Ownership prior to 2021. On June 26, 2020, in accordance with Fla. Stat. §721.1255 and section 25.6 of the

Declaration, 809 Owners of Unit Weeks (out of a total of 1,191 Owners of Unit Weeks owners that voted) voted not to continue with the Interval Ownership.

15.     On January 1, 2021, the Interval Ownership interests held by the Owners of Unit Weeks for each Unit, including the Association Owned Unit Week Interests, became tenants in common in accordance with the Declaration.

16.     On May 14, 2021, the Association entered into a sale and purchase agreement for sale of all the Units for the total price of $9,755,000.00.

**The Adversary Proceeding: §363(h) Authority**

17.     On June 7, 2021, Debtor commenced the adversary styled as Palm Beach Resort and Beach Club Condominium Association, Inc. v. HPP Holdings, LLC, et al., Adversary Proceeding No. 21-01168-EPK, by filing its complaint (the "Complaint") [Adv. ECF # 1] against all tenants in common Unit-Week interest co-owners, and seeking authorization to sell the non-Debtor, co-owners' interests in the Condominium and each and every Unit pursuant to 11 U.S.C. § 363(h).  The Complaint further sought authorization to incur all court costs associated with the adversary, attorneys fees, and associated costs of the sale transactions. In addition, the Debtor filed the action against additional parties, but subsequently dismissed those certain parties [Adv. ECF # 99].

18.     On December 23, 2021, the Court entered Summary Final Judgment [Adv. ECF # 79], Final Judgment Pursuant to Stipulation [ECF # 81], and Default Final Judgements [Adv. ECF # 77], against all tenants in common Unit-Week interest co-owners in the Units. The judgments authorized the sale of all co-owned tenants in common Unit-Week interests, as well as the associated fees and costs.

**Claims Against the Estate and Tenant in Common Unit-Week Co-Owned Units**

19.     The Plan as confirmed requires the payment at closing of the sale transaction of all administrative expense claims and class 2 claimants, and the distribution of net sale proceeds to the unit-week co-owners as contemplated by the Plan.

20.     On June 25, 2021, the Court authorized a procedure whereby any party who may claim title interest in the Units that is otherwise different than that which Debtor had on its books and records was able to file a claim on or before November 30, 2021[2] [ECF ## 37 and 66]. To date, there have been no claims by **non-present tenants in common Unit-Week interest co-owners** as appearing on the Debtor's records.

21.     Based on analysis, the sum of all claims to be paid pursuant to the Plan are significantly less than the Debtor's interest from any net proceeds.

## THE PROPOSED PRIVATE SALE

### The Terms of the Proposed Private Sale Agreement

22.     The purchase and sale agreement with Copperline Partners, LLC is in the amount of $9,755,000.00.  The contemplated transaction is an arms-length transaction, and neither the Purchaser, nor any of its member(s), are insiders of the Debtor.

23.     The agreement with Copperline Partners, LLC is the culmination of extensive and prolonged marketing of the Units that took place prior to commencement of this bankruptcy proceeding. The purchase price is the result of extensive negotiations and is the highest and **best** offer that the Debtors have received, and it is in line with current market prices.

---

[2] On October 12, 2021, the Court extended the deadline to file Proof of Owner of Unit-Week Interest through November 30, 2021.

24.     As such, the Debtor and the Purchaser have agreed to the terms contained in the "Purchase and Sale Agreement" (along with addendums) attached hereto as **Exhibit "B"** (the "Agreement")[3], the primary material terms of which are as follows:

a. **Purchase Price**: $9,755,000 (the "Purchase Price").

b. **Deposit:** $1,000,000[4].

c. **Sum at Closing:** $8,755,000.

d. **Terms**: Subject to inspection and pre-conditions as detailed in the Agreement, all of which have been satisfied. Accordingly, it is, as-is, where-is, and free and clear of all liens, claims and encumbrances. Further, all of Debtor's liquid financial assets held in the estate's bank accounts are excluded from the sale and are specifically designated as additional assets of the Debtor that shall be transferred to the Disbursing Agent at closing.

e. **Closing Date**: as detailed in the Agreement, as may be accelerated and rescheduled by mutual agreement of the parties to the Agreement.

f. **Commission**: a 1% of Purchase Price is payable to Robert S. MacGregor by and through his entity, Share Trust, Inc., the listing broker, pursuant to the Commercial Exclusive Right of Sale Contract, listed on the Debtor's schedules, and assumed as part of the confirmed plan of liquidation [ECF ## 53 and 97].[5]

g. **Financing:** Purchaser may obtain financing, but such financing is not a condition to close the contemplated transaction.

h. **Purchase of All Assets Located Therein Units:** Purchaser is acquiring all FFE located therein the Units.

i. **Subject to Bankruptcy Court approval**

25.     The Purchaser has already deposited $1,000,000 with the escrow agent.

---

[3] Parties to be served with this Motion will not receive a copy of Exhibit B, given the voluminous nature of the Agreement and its amendments thereto.  A complete copy of **Exhibit B** is available for review at the following address: https://www.eisingerlaw.com/palmbeachresort-bankruptcy/ .

[4] The deposit is presently held by the escrow agent for the transaction.

[5] Mr. MacGregor is a board member, however, this amount was disclosed to all co-owners prior to the Petition Date, and is well below market brokerage fees, and resulting in a net savings to the Estate.

## RELIEF SOUGHT

**The Sale Should Be Approved
Pursuant to 11 U.S.C. §§ 363(b), (f) and (m)**

26.     The Debtors request that the Court approve the sale of the Properties to the Purchaser, pursuant to 11 U.S.C. § 363(f), free and clear of any and all liens, claims and encumbrances, upon the terms set forth above.  The Debtors also request that the Court authorize the Debtors to enter into the Contract and approve the payment of Broker as outlined herein.

27.     Pursuant to 11 U.S.C. § 363(b), "[t]he trustee, after notice and hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate."

28.     Additionally, 11 U.S.C. § 363(f) permits the Debtors to "…sell property under subsection (b) … of this section free and clear of any interest in such property of an entity other than the estate, only if –

(1) applicable non-bankruptcy law permits sale of such property free and clear of such interest;
(2) such entity consents;
(3) such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;
(4) such interest is in bona fide dispute; or
(5) such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest".

29.     Since there are no liens, but instead only the claims to be paid as provided for under the confirmed Plan, the sale price of the Units is greater than the aggregate value of all claims provided for in the Plan such that 11 U.S.C. 363(f)(3) is satisfied.

30.     For all of the above reasons, the Court should authorize the sale of the Units, free and clear of any and all liens, claims and encumbrances, with any such liens, claims and encumbrances, to attach to the proceeds.

31.     Furthermore, the Debtor request that at closing, the Purchaser will be deemed a good faith purchaser within the meaning of 11 U.S.C. § 363(m), provided that the

Purchaser has complied with all requirements of the Contract. Pursuant to 11 U.S.C. § 363(m), the reversal or modification on appeal of a transaction authorized under Section 363(b) of the Bankruptcy Code does not affect the validity of the sale to an entity that acquired the property in good faith.

32.     The Debtor, exercising its business judgment, believe that the sale of the Units to the Purchaser is in the best interest of the bankruptcy estate and is a requirement of the Plan as confirmed. Therefore, Debtor requests authority to close the sale.

### Authority to Close the Sale, Pay All Expenses, Fees and Costs of Sale and Any Associated with the Outstanding Ongoing Operations of the Debtor

33.     Debtor by and through its board president should be authorized to execute any and all documents necessary to effectuate the closing including the deed and related documents necessary to consummate the closing of the sale transaction

34.     As part of the sale process, Debtor requests authorization to pay all fees and costs associated with the sale, disburse the net sales proceeds to disbursing agent, Maria Yip ("Disbursing Agent", as defined in the Plan), pursuant to the confirmed plan, who shall distribute the net amounts pursuant to the Plan.  Each tenant in common Unit-Week Interest co-owners shall receive their interest pursuant to the procedure outlined in the Plan and as supplemented and/or modified herein.

35.     Further, the Debtor has and will incur expenses, fees and costs post-confirmation through closing date, inclusive of its management company, professionals' fees and costs. Accordingly, contemporaneous with Closing, final consummation of the Plan, and transfer of funds to the Disbursing Agent, Debtor should be authorized to pay, by and through the Disbursing Agent, all such outstanding amounts owed by the Debtor for the period between post-confirmation and through closing. Such payments are in addition to any distributions to be made pursuant to the confirmed Plan and any outstanding order by

this Court. The Disbursing Agent shall include such information in any reports required to be filed with the Court.

### Procedure for Distribution of Net Sale Proceeds to Tenant in Common Unit-Week Interest Co-Owners

36.     After accounting for all fees, costs and other contemplated charges associated with the sale transaction, tenant in common Unit-Week Interest co-owners will be entitled to receive a distribution of their interests, pursuant to the terms provided in the Plan and as proposed herein. The Court has already approved the distribution and process as part of the Plan. In addition to the previously approved distribution process, Debtor proposes the following administrative process to further enhance and facilitate such distribution process:

A)     Checks Payees and Address of Payee: Checks issued to Unit-Week Owners by the Disbursing Agent shall be made to **all named** owners of a particular Unit-Week as appearing on the Debtor's records and on title to the Unit-Week. Checks issued to multiple owners shall be sent, via U.S. Mail or like-kind delivery method, to the primary address of record as appearing on the Debtor's books and records. In the event of multiple addresses on record and/or multiple owners, the check in the name of all owners shall be sent to the address of only one of the owners who has been the **primary** responsible party for payment of Association dues/assessment in the 12-month period prior to commencement of the bankruptcy case. Primary shall mean the majority of all payments made to the Association during the foregoing period. To the extent the Disbursing Agent cannot determine an address to send the check, considering multiple conflicting addresses and unclear assessment payment history, the Disbursing Agent shall exercise her business judgement in sending the payment to an address she determines.

B)     Distribution Payment to Owners of Multiple Unit-Week Ownership Interests: To the extent a single entity or person own multiple Unit-Week Interests, the Disbursing Agent, in her business judgment, may issue a single check and/or facilitate such distribution payment via electronic means rather than multiple check payments so as to save the Estate the costs associated with payment of those funds.

C)     Distribution to Unit-Week Interest Owners: The Disbursing Agent shall distribute to Unit-Week Owners in two or more rounds. Prior to first round distribution, Disbursing Agent shall e-mail/mail a notice to all **primary** Unit-Week Owners of record with a request for address confirmation (the address to which payment will be sent) with a 30-day period to update payee

information (to be determined pursuant to the administrative process outlined in this Motion). To the extent no response shall be received, the payee address shall be the address identified by the Disbursing Agent pursuant to the process outlined in this Motion. First, Disbursing Agent shall remit the net amount owed to any Unit-Week owner (less any sums owed to Estate, as provided for under the Plan) for their Unit-Week Interest based on the Declaration's common elements percentage, per unit type and a 1/52 allocation. Then, the Disbursing Agent may, in her business judgment, distribute in one or more additional distributions, the Debtor's interests in Unit-Weeks together with all other sums held in reserve accounts, operating accounts, or any other account of the Estate, after accounting for fees and costs of administration of the remaining Estate, and while providing for adequate sums as reserves to ensure the operation of the Estate through the final distribution and closure of the Estate.

D)    <u>Estate Distributions</u>: To extent any final distribution of Estate funds to co-owners is determined by the Disbursing Agent in her business judgment to be de minimis so as to render such distribution to be less than the administrative costs and fees associated with facilitating such distribution, then such funds shall be tendered to the Bankruptcy Bar Association for the Southern District of Florida, after first deducting for any remaining fees and costs incurred by the Disbursing Agent and her professionals in closing the Estate.

E)    <u>Distribution to Unknown Heirs</u>: To the extent a payment is to be made to unknown heirs of a Unit-Week Interest owner, **without** any other co-owner on said Unit-Week, such payment shall be held by the Disbursing Agent for a period of up to 180 days, subject to demands and proof by the lawful heirs[6], after which, if no demand and adequate proof provided, such payment shall be sent to the State of Florida Unclaimed Funds.  If a distribution payment is to be made to a known Unit-Week Interest owner **and** an Unknown Heir, then such payment shall be made in the name of the known Unit-Week Interest Owner party and the Unknown Heir of the other co-owner of the Unit-Week, and such payment shall be sent to the known party.

F)    <u>Undelivered Payments</u>: Shall be governed in accordance with the terms of the Plan, as confirmed.


WHEREFORE, the Debtor respectfully request entry of an Order substantially in the

form attached hereto as **Exhibit "C"**[7]:

---

[6] Lawful Heir is an heir pursuant to probate court order or other proof of lawful transfer of ownership by a decedent.
[7]  Parties to be served with this Motion will not receive a copy of Exhibit C, given the voluminous nature of the proposed order.  A complete copy of **Exhibit C** is available for review at the following address: https://www.eisingerlaw.com/palmbeachresort-bankruptcy/ .

(a)     granting the Motion;

(b)     authorizing the sale of the Units and all assets located therein (Furniture, Fixture and Equipment) to Purchaser, free and clear of all liens, claims, and encumbrances;

(c)     authorizing the Debtor through its board president to execute any and all documents necessary to effectuate the closing including the deed and related documents;

(d)     approving the Purchaser as a good faith purchaser

(e)     approving the Agreement and authorizing the Debtor to execute all associated documents to effectuate closing;

(f)     authorizing the Debtor to pay all fees, costs and expenses associated with the sale including the payment of broker fees in the amount of 1% or $97,755 (pursuant to the previously assumed contract with the broker as part of the confirmed Plan), and liabilities of Debtor incurred post-confirmation through closing, including management fees, and all professional fees and costs.

(g)     approving distribution procedure as provided herein;

and

(j)     granting all such further relief as this Court deems appropriate under the circumstances.

Dated: January 17, 2022.

ALIGNX LAW
Counsel to the Debtor
12555 Orange Drive
Suite 4159
Davie, Florida 33330
Telephone: (954) 686-7399

By:_____/s/_____
        IDO J. ALEXANDER
        Florida Bar No. 51842
        ija@alignxlaw.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the foregoing was served on January 17, 2022, to all parties on the list to receive e-mail notice/service for this case, via the Notice of Electronic Filing (which is incorporated herein by reference.

By:_____/s/_____
     Ido J. Alexander

**EXHIBIT "A"**
**(Legal Description of Units)**

**EXHIBIT "A"**
**(Units Legal Description)**

| Unit No. | Legal Description |
|---|---|
| 101 | Condominium Unit 101, THE PALM BEACH RESORT AND BEACH CLUB, a Condominium, according to the Declaration of Condominium recorded in Official Record Book 3464 at Page 1474, in the Public Records of Palm Beach County, Florida, together with any and all exhibits and amendments thereto. |
| 102 | Condominium Unit 102, THE PALM BEACH RESORT AND BEACH CLUB, a Condominium, according to the Declaration of Condominium recorded in Official Record Book 3464 at Page 1474, in the Public Records of Palm Beach County, Florida, together with any and all exhibits and amendments thereto. |
| 103 | Condominium Unit 103, THE PALM BEACH RESORT AND BEACH CLUB, a Condominium, according to the Declaration of Condominium recorded in Official Record Book 3464 at Page 1474, in the Public Records of Palm Beach County, Florida, together with any and all exhibits and amendments thereto. |
| 104 | Condominium Unit 104, THE PALM BEACH RESORT AND BEACH CLUB, a Condominium, according to the Declaration of Condominium recorded in Official Record Book 3464 at Page 1474, in the Public Records of Palm Beach County, Florida, together with any and all exhibits and amendments thereto. |
| 105 | Condominium Unit 105, THE PALM BEACH RESORT AND BEACH CLUB, a Condominium, according to the Declaration of Condominium recorded in Official Record Book 3464 at Page 1474, in the Public Records of Palm Beach County, Florida, together with any and all exhibits and amendments thereto. |
| 106 | Condominium Unit 106, THE PALM BEACH RESORT AND BEACH CLUB, a Condominium, according to the Declaration of Condominium recorded in Official Record Book 3464 at Page 1474, in the Public Records of Palm Beach County, Florida, together with any and all exhibits and amendments thereto. |
| 107 | Condominium Unit 107, THE PALM BEACH RESORT AND BEACH CLUB, a Condominium, according to the Declaration of Condominium recorded in Official Record Book 3464 at Page 1474, in the Public Records of Palm Beach County, Florida, together with any and all exhibits and amendments thereto. |
| 108 | Condominium Unit 108, THE PALM BEACH RESORT AND BEACH CLUB, a Condominium, according to the Declaration of Condominium recorded in Official Record Book 3464 at Page 1474, in the Public Records of Palm Beach County, Florida, together with any and all exhibits and amendments thereto. |
| 109 | Condominium Unit 109, THE PALM BEACH RESORT AND BEACH CLUB, a Condominium, according to the Declaration of Condominium recorded in Official Record Book 3464 at Page 1474, in the Public Records of Palm Beach County, Florida, together with any and all exhibits and amendments thereto. |
| 110 | Condominium Unit 110, THE PALM BEACH RESORT AND BEACH CLUB, a Condominium, according to the Declaration of Condominium recorded in Official Record Book 3464 at Page 1474, in the Public Records of Palm Beach County, Florida, together with any and all exhibits and amendments thereto. |
| 111 | Condominium Unit 111, THE PALM BEACH RESORT AND BEACH CLUB, a Condominium, according to the Declaration of Condominium recorded in Official Record Book 3464 at Page 1474, in the Public Records of Palm Beach County, Florida, together with any and all exhibits and amendments thereto. |
| 112 | Condominium Unit 112, THE PALM BEACH RESORT AND BEACH CLUB, a Condominium, according to the Declaration of Condominium recorded in Official Record Book 3464 at Page 1474, in the Public Records of Palm Beach County, Florida, together with any and all exhibits and amendments thereto. |
| 201 | Condominium Unit 201, THE PALM BEACH RESORT AND BEACH CLUB, a Condominium, according to the Declaration of Condominium recorded in Official Record Book 3464 at Page 1474, in the Public Records of Palm Beach County, Florida, together with any and all exhibits and amendments thereto. |
| 202 | Condominium Unit 202, THE PALM BEACH RESORT AND BEACH CLUB, a Condominium, according to the Declaration of Condominium recorded in Official Record Book 3464 at Page 1474, in the Public Records of Palm Beach County, Florida, together with any and all exhibits and amendments thereto. |
| 203 | Condominium Unit 203, THE PALM BEACH RESORT AND BEACH CLUB, a Condominium, according to the Declaration of Condominium recorded in Official Record Book 3464 at Page 1474, in the Public Records of Palm Beach County, Florida, together with any and all exhibits and amendments thereto. |

**EXHIBIT "A"**
**(Units Legal Description)**

| Unit No. | Legal Description |
|---|---|
| 204 | Condominium Unit 204, THE PALM BEACH RESORT AND BEACH CLUB, a Condominium, according to the Declaration of Condominium recorded in Official Record Book 3464 at Page 1474, in the Public Records of Palm Beach County, Florida, together with any and all exhibits and amendments thereto. |
| 205 | Condominium Unit 205, THE PALM BEACH RESORT AND BEACH CLUB, a Condominium, according to the Declaration of Condominium recorded in Official Record Book 3464 at Page 1474, in the Public Records of Palm Beach County, Florida, together with any and all exhibits and amendments thereto. |
| 206 | Condominium Unit 206, THE PALM BEACH RESORT AND BEACH CLUB, a Condominium, according to the Declaration of Condominium recorded in Official Record Book 3464 at Page 1474, in the Public Records of Palm Beach County, Florida, together with any and all exhibits and amendments thereto. |
| 207 | Condominium Unit 207, THE PALM BEACH RESORT AND BEACH CLUB, a Condominium, according to the Declaration of Condominium recorded in Official Record Book 3464 at Page 1474, in the Public Records of Palm Beach County, Florida, together with any and all exhibits and amendments thereto. |
| 208 | Condominium Unit 208, THE PALM BEACH RESORT AND BEACH CLUB, a Condominium, according to the Declaration of Condominium recorded in Official Record Book 3464 at Page 1474, in the Public Records of Palm Beach County, Florida, together with any and all exhibits and amendments thereto. |
| 209 | Condominium Unit 209, THE PALM BEACH RESORT AND BEACH CLUB, a Condominium, according to the Declaration of Condominium recorded in Official Record Book 3464 at Page 1474, in the Public Records of Palm Beach County, Florida, together with any and all exhibits and amendments thereto. |
| 210 | Condominium Unit 210, THE PALM BEACH RESORT AND BEACH CLUB, a Condominium, according to the Declaration of Condominium recorded in Official Record Book 3464 at Page 1474, in the Public Records of Palm Beach County, Florida, together with any and all exhibits and amendments thereto. |
| 211 | Condominium Unit 211, THE PALM BEACH RESORT AND BEACH CLUB, a Condominium, according to the Declaration of Condominium recorded in Official Record Book 3464 at Page 1474, in the Public Records of Palm Beach County, Florida, together with any and all exhibits and amendments thereto. |
| 212 | Condominium Unit 212, THE PALM BEACH RESORT AND BEACH CLUB, a Condominium, according to the Declaration of Condominium recorded in Official Record Book 3464 at Page 1474, in the Public Records of Palm Beach County, Florida, together with any and all exhibits and amendments thereto. |
| T-1 / 301 | Condominium Unit T-1 / 301, THE PALM BEACH RESORT AND BEACH CLUB, a Condominium, according to the Declaration of Condominium recorded in Official Record Book 3464 at Page 1474, in the Public Records of Palm Beach County, Florida, together with any and all exhibits and amendments thereto. |
| T-2 / 302 | Condominium Unit T-2/302, THE PALM BEACH RESORT AND BEACH CLUB, a Condominium, according to the Declaration of Condominium recorded in Official Record Book 3464 at Page 1474, in the Public Records of Palm Beach County, Florida, together with any and all exhibits and amendments thereto. |
| T-3 / 303 | Condominium Unit T-3/303, THE PALM BEACH RESORT AND BEACH CLUB, a Condominium, according to the Declaration of Condominium recorded in Official Record Book 3464 at Page 1474, in the Public Records of Palm Beach County, Florida, together with any and all exhibits and amendments thereto. |
| T-4 / 304 | Condominium Unit T-4/304, THE PALM BEACH RESORT AND BEACH CLUB, a Condominium, according to the Declaration of Condominium recorded in Official Record Book 3464 at Page 1474, in the Public Records of Palm Beach County, Florida, together with any and all exhibits and amendments thereto. |
| T-5 / 305 | Condominium Unit T-5/305, THE PALM BEACH RESORT AND BEACH CLUB, a Condominium, according to the Declaration of Condominium recorded in Official Record Book 3464 at Page 1474, in the Public Records of Palm Beach County, Florida, together with any and all exhibits and amendments thereto. |

**EXHIBIT "B"**
**(Purchase and Sale Agreement with Amendments thereto)**

## PURCHASE AND SALE AGREEMENT

THIS PURCHASE AND SALE AGREEMENT, ("**Agreement**"), is made and entered into as of this **14** day of May, 2021, (the "**Effective Date**"), by and between **PALM BEACH RESORT AND BEACH CLUB CONDOMINIUM ASSOCIATION, INC.**, a Florida not-for-profit corporation, or such other person or entity that may be deemed the Seller elsewhere under this Agreement, (the "**Seller**"), and **COPPERLINE PARTNERS, LLC**, a Florida limited liability company, (the "**Purchaser**").

**WHEREAS**, the Seller owns, in whole or in part, the Property (defined below) used in a fractional timeshare operation with approximately _____ members of the Association (defined below) utilizing the Property as a timeshare;

**WHEREAS**, the Association has terminated the timeshares and the members of the Association have commenced an action seeking, among other things a partition of the Property;

**WHERES**, the Seller has determined, in its business judgment, that it is in the best interest of the Seller, its creditors and members of the Association, to sell the Property in a single transaction to the Purchaser in a private sale under the terms and conditions set forth in this Agreement;

**WHEREAS**, the Seller has determined, in its business judgment, that partitioning the Property or selling the Property, in whole or in part, to any other party or in an alternative transaction, including without limitation a competitive sale transaction, would not yield any higher or better offer, or greater benefit to the Seller, its creditors or members of the Association;

**NOW, THEREFORE**, in consideration of the mutual agreements herein contained, the parties hereto agree as follows:

1.     **Purchase and Sale.** Seller agrees to sell to Purchaser and Purchaser agrees to purchase from Seller all Condominium Units, (the "**Units**", or individually, a "**Unit**"), of The Palm Beach Resort and Beach Club Condominium, (the "**Condominium**"), according to the Declaration of Condominium thereof, as recorded in Official Records Book 3464, at Page 1474, of the Public Records of Palm Beach County, Florida, (as amended, the "**Declaration**"), which Declaration encumbers the real property described on **Exhibit A** attached to this Agreement and made a part hereof, together with all Common Elements appurtenant thereto, (the "**Common Elements**"; all Units and Common Elements being collectively referred to herein as the "**Land**"), together with the following property and rights (except as otherwise expressly set forth elsewhere herein):

> (a)     Improvements. All improvements located on the Land, including buildings, structures and other facilities, (the "**Improvements**"; the Land and the Improvements are hereinafter collectively referred to as the "**Realty**");

> (b)     FFE and Personal Property. All fixtures, furnishings, equipment and items of personal property used or useful in the operation, repair and maintenance of the Realty, and situated on the Realty and owned by Seller, (collectively, the "**Personal Property**"; the Realty and the Personal Property being hereinafter sometimes collectively referred to as the "**Property**").

However, notwithstanding anything to the contrary contained in this Paragraph 1 or elsewhere in this Agreement, the following personal property, (the "**Excluded Property**"), shall not be included in the purchase and sale transaction contemplated by this Agreement, nor shall it be included in or deemed part of the Personal Property, or the Property, for purposes of this Agreement, regardless of whether or not such Excluded Property is actually located on the Realty or any portion thereof at any time on or after the Effective Date of this Agreement: (i) Consumable goods of or belonging to the Association or Seller which are or shall be actually used or consumed by or at the direction of the Association or Seller in the daily operations of the Condominium and/or the Realty prior to Closing; (ii) All operating, reserve and other accounts and monies, and accounts receivable, of or belonging to the Association or Seller as of the date of Closing, (collectively, the "**Pre-Closing Association Funds**"); and (iii) Any tangible personal property of or belonging to any person or entity who or that is a member of the Association, any

guest of any Unit, or the Association's management company (including, without limitation, any computers, printers or similar equipment owned by such management company); it being expressly understood and agreed that (x) upon Closing, the Condominium will still exist and the Association will still be an active corporation, thereby, in effect, rendering Purchaser the sole member of said Association as of the Closing, but (y) following Closing, all net proceeds from the sale of the Property to Purchaser, and all other monies held or maintained by or for the benefit of the Association as of the date and time of the Closing (including, without limitation, any and all Pre-Closing Association Funds) shall nevertheless be for the sole account and benefit of, and shall be disbursed (or liquidated and then disbursed) by the Board of Directors of the Association as it existed immediately prior to Closing (or by a trustee or other person or entity appointed by a court of competent jurisdiction to oversee and administer such disbursements) to, and only to, all persons and entities who or that were members of the Association immediately prior to the Closing (or their respective mortgagees or other designees), with Purchaser having no right or claim to, or to keep for its own account or benefit (or for the account or benefit of the Association then controlled by it), any such net proceeds or other monies held or maintained by or for the benefit of the Association as of the date and time of the Closing, and (z) subsequent to Closing, Purchaser shall fully cooperate with the Board of Directors of the Association as it existed immediately prior to Closing (or with the trustee or other person or entity appointed by a court of competent jurisdiction to oversee and administer the aforesaid disbursements) in effectuating the provisions of and disbursements contemplated by the preceding subparagraph (y). For purposes hereof, the term "**Association**" shall mean and refer to PALM BEACH RESORT AND BEACH CLUB CONDOMINIUM ASSOCIATION, INC., a Florida not-for-profit corporation. The provisions of this paragraph shall expressly survive the Closing.

2.      **Purchase Price.** The purchase price to be paid by Purchaser to Seller for the Property is **NINE MILLION SEVEN HUNDRED FIFTY FIVE THOUSAND AND 00/100 DOLLARS ($9,755,000.00),** (the "**Purchase Price**"). To secure the performance by Purchaser of its obligations under this Agreement: (a) Within two (2) Business Days of receipt of the Agreement executed by Seller, Purchaser shall deliver to EISINGER LAW, located at 4000 Hollywood Boulevard, Suite 265-S, Hollywood, Florida 33021, as Escrow Agent, (the "**Escrow Agent**"), the sum of (i) **TWO HUNDRED FIFTY THOUSAND AND 00/100 DOLLARS ($250,000.00),** (the "**Initial Deposit**"), plus (ii) an additional **TWO HUNDRED FIFTY THOUSAND AND 00/100 DOLLARS ($250,000.00),** (the "**Nonrefundable Deposit**"), each of which shall be held as an initial earnest money deposit hereunder in accordance with the terms of this Agreement; and (b) Within two (2) Business Days after the expiration of the Inspection Period (as hereinafter defined), Purchaser shall deliver to the Escrow Agent the additional sum of **FIVE HUNDRED THOUSAND and 00/100 DOLLARS ($500,000.00),** which shall be held as an additional earnest money deposit hereunder in accordance with the terms of this Agreement, (the "**Additional Deposit**"; the Initial Deposit, the Nonrefundable Deposit and the Additional Deposit being hereinafter collectively referred to as the "**Deposit**"). All interest accrued on the Deposit, if any, shall accrue to the benefit of Purchaser, except in the event of a Purchaser default pursuant to Paragraph 10 hereinbelow.

3.      **Terms of Payment; Cash Deal.** The Purchase Price shall be paid by Purchaser to Seller as follows:

| | |
|---|---|
| $1,000,000.00 | being the total Deposit referred to in Paragraph 2 of this Agreement, which sum shall be paid to Seller (via Escrow Agent) at Closing. |
| $8,755,000.00 | in current funds at time of Closing, subject to prorations and adjustments as hereinafter provided, to be paid to Seller (via Escrow Agent) by wire transfer of Federal Funds. |
| $9,755,000.00 | Total Purchase Price. |

Purchaser shall pay cash for the purchase of the Property at Closing. There is no financing contingency to Purchaser's obligation to close the transaction contemplated by this Agreement. Notwithstanding the foregoing, Purchaser shall have the right to obtain mortgage financing in connection with the closing of the transaction, provided, however, that: (a) This Agreement and Purchaser's obligations under this Agreement will not depend on whether or not Purchaser qualifies for or obtains a mortgage loan from any lender; (b) Purchaser will be solely responsible for making Purchaser's own financial arrangements; and (c) If Purchaser obtains a loan for any part of the Purchase Price of the Property, Purchaser acknowledges that any terms and conditions imposed by Purchaser's lender(s) or by CFPB Requirements shall not affect or extend Purchaser's obligation to close or otherwise affect any terms or conditions of this Agreement.

2

4.    **Title.**

(a)    Within thirty (30) days following the Effective Date of this Agreement, Seller, at Seller's expense, shall obtain from COMMONWEALTH LAND TITLE INSURANCE COMPANY, or other title company selected by Seller (the "**Title Company**"), via Seller's legal counsel, EISINGER LAW, acting as agent for the Title Company, (the "**Title Agent**"), and shall provide to Purchaser, a commitment for an owner's ALTA title insurance policy in favor of Purchaser (as the named proposed insured thereunder) in the amount of the Purchase Price, (the "**Commitment**"). The Commitment shall be endorsed and updated at Seller's expense one time during the period commencing on the date which is twenty (20) days before the date of Closing and ending on the date which is five (5) days before the date of Closing, (the "**Endorsement Period**"), and Seller shall deliver to Purchaser such endorsement updating the Commitment, (the "**Endorsement**"), prior to the expiration of said Endorsement Period (provided, however, that an additional update to the Commitment shall also be provided by Seller to Purchaser within fifteen (15) days following Seller's receipt from Purchaser of any request for such an update; provided that (x) any such request shall be received by Seller following Seller's delivery to Purchaser of the Commitment but prior to Seller's delivery to Purchaser of the Endorsement during the Endorsement Period, (y) Purchaser shall not make any such request more than one time during any consecutive 60-day period, and (z) all costs incurred in connection with Seller obtaining any such update shall be borne by and paid for by Purchaser). The Commitment and the Endorsement thereof shall show, with respect to each Unit, the owner(s) of such Unit to be vested with good and marketable fee simple title to said Unit, free and clear of all liens, encumbrances and other matters, except only the following, (the "**Permitted Exceptions**"); provided, however, that the Commitment may set forth requirement(s) as to how a trustee or other person or entity appointed by a court of competent jurisdiction to act on behalf of the Association may itself, himself or herself (i.e., without joinder of any of the owner(s) of the Units) sufficiently convey to Purchaser fee simple title to the entirety of the Realty pursuant to the Court Sale Order (as hereinafter defined), in which event such trustee or other court-appointed person or entity, acting on behalf of the Association, shall be construed as the Seller under this Agreement: (i) Ad valorem real estate taxes for the year in which the Closing shall occur and subsequent years which are not yet due and payable, including but not limited to the Town of Palm Beach, Florida Underground Utility Assessment not yet due and payable; (ii) All applicable zoning ordinances and regulations, none of which shall prohibit or otherwise interfere with all uses presently being made of the Property; (iii) Restrictions or matters appearing on the plat or otherwise common to the subdivision; and (iv) Those exceptions set forth on **Exhibit B** attached to this Agreement and made a part hereof, (the "**Special Exceptions**").

(b)    Purchaser shall have until the end of the Title Examination Date (as hereinafter defined) to obtain, at Purchaser's expense, a survey of the Realty showing and certifying the exact location and legal description of the Realty and meeting the minimum technical standards of the American Land Title Association, the Florida Board of Land Surveyors and the State of Florida Department of Professional Regulation, certified to Purchaser, the Title Company and the Title Agent, and prepared as of a date subsequent to the date of this Agreement, (the "**Survey**").

(c)    Title shall be deemed good and marketable only if the Commitment allows for issuance of an owner's ALTA policy effective as of Closing at minimum promulgated risk rate premiums, without any guarantees and without any exceptions, standard or otherwise, other than the Permitted Exceptions, and other than title defect(s) which shall be removed by Seller on or before the date of Closing, in accordance with the standards adopted from time to time by The Florida Bar.

(d)    Purchaser shall have until (and including) the date which is fifteen (15) days following the date on which the Commitment shall be delivered to Purchaser, (the "**Title Examination Date**"), to examine the Commitment and the Survey. If Purchaser finds title to be defective, Purchaser shall, no later than the Title Examination Date, deliver to Seller written Notice specifying each such title defect, (the "**Title Defect Notice**").

(e)    If Purchaser fails to deliver to Seller any Title Defect Notice on or before the Title Examination Date, then, except to the extent that any New Title Defect(s) (as hereinafter defined) may be raised as title objections to Closing the transaction contemplated by this Agreement as provided hereinbelow, (i) all matters shown in the Commitment and/or the Survey shall be deemed to be waived by Purchaser as title objections to Closing such transaction, (ii) Purchaser shall be deemed to have waived all other title objections to such Closing, and (iii) Purchaser shall close said transaction on the scheduled date of Closing and accept title to the Realty "as is" without reduction in the Purchase Price and without claim against Seller therefor.

3

(f)      If Purchaser does deliver to Seller a Title Defect Notice on or before the Title Examination Date, then: (i) Except to the extent that any New Title Defect(s) may be raised as title objections to Closing the transaction contemplated by this Agreement as provided hereinbelow, (y) all matters shown in the Commitment and/or the Survey but not specifically listed as title defect(s) in such Title Defect Notice shall be deemed to be waived by Purchaser as title objections to Closing the transaction contemplated by this Agreement, and (z) Purchaser shall be deemed to have waived all other title objections to such Closing not specifically listed in said Title Defect Notice; and (ii) Seller shall have until (and including) the date which is ten (10) days following its receipt of such Title Defect Notice, (the "**Title Response Date**"), to deliver to Purchaser written Notice, (the "**Title Response**"), specifying each alleged title defect set forth in the Title Defect Notice which Seller (y) deems not to be a title defect (i.e., which Seller contends does not render title to the Realty other than as represented in this Agreement), and/or (z) does not intend to cure (or cause to be cured) by the date of Closing, (collectively, the "**Rejected Title Defects**").

(g)      If Purchaser does deliver to Seller a Title Defect Notice on or before the Title Examination Date, but Seller thereafter fails to deliver to Purchaser any Title Response specifying one or more Rejected Title Defects on or before the Title Response Date, then Seller shall use commercially reasonable efforts to cause all such title defects set forth in the Title Defect Notice to be cured by the date of Closing (provided, however, that Seller shall not be required, under any circumstances, to remove by payment, bonding, or otherwise any lien against the Property or to bring suit to cure any title defect or to buy-out or settle any claim or lien against the Property; except that Seller shall be required to cure all title defects listed in the Title Defect Notice which were caused by Seller, and Seller shall also be required to pay up to $100,000 to cure any other title defects listed in the Title Defect Notice); and in the event that Seller does not, as of the date of Closing, eliminate any or all such title defects, then Purchaser shall have the option of either: (i) Closing and accepting the title "as is," without reduction in the Purchase Price and without claim against Seller therefor; or (ii) Cancelling this Agreement by delivering written Notice of such cancellation to Seller, in which event the Escrow Agent shall return the entire Deposit (i.e., to the extent that such Deposit is then being held by the Escrow Agent in cleared funds) and all interest accrued thereon to Purchaser, whereupon both Seller and Purchaser shall be released from all further obligations under this Agreement, except for those obligations which are expressly stated herein to survive termination of this Agreement.

(h)      If Purchaser does deliver to Seller a Title Defect Notice on or before the Title Examination Date, and Seller thereafter does deliver to Purchaser a Title Response specifying one or more Rejected Title Defects on or before the Title Response Date, then, if any one or more of such Rejected Title Defects set forth in said Title Response do, in fact, render title to the Realty other than as represented in this Agreement, Purchaser shall have until (and including) the date which is five (5) days following its receipt of such Title Response, (the "**Title Cancellation Date**"), to deliver to Seller written Notice of Purchaser's election to cancel this Agreement, (the "**Title Cancellation Notice**"). If Purchaser does deliver a proper Title Cancellation Notice to Seller on or before the Title Cancellation Date, then the Escrow Agent shall return the entire Deposit (i.e., to the extent that such Deposit is then being held by the Escrow Agent in cleared funds) and all interest accrued thereon to Purchaser, whereupon both Seller and Purchaser shall be released from all further obligations under this Agreement, except for those obligations which are expressly stated herein to survive termination of this Agreement. If Purchaser fails to deliver such a proper Title Cancellation Notice to Seller on or before the Title Cancellation Date, then (i) all Rejected Title Defects shall be deemed to be waived by Purchaser as title objections to Closing the transaction contemplated by this Agreement, and (ii) Seller shall use commercially reasonable efforts to cause all such title defects set forth in the Title Defect Notice, other than the Rejected Title Defects, to be cured by the date of Closing (provided, however, that Seller shall not be required, under any circumstances, to remove by payment, bonding, or otherwise any lien against the Property or to bring suit to cure any title defect or to buy-out or settle any claim or lien against the Property; except that Seller shall be required to cure all title defects listed in the Title Defect Notice (other than the Rejected Title Defects) which were caused by Seller, and Seller shall also be required to pay up to $100,000 to cure any other title defects listed in the Title Defect Notice (other than the Rejected Title Defects)); and in the event that Seller does not, as of the date of Closing, eliminate any or all such title defects (other than the Rejected Title Defects), then Purchaser shall have the option of either: (i) Closing and accepting the title "as is," without reduction in the Purchase Price and without claim against Seller therefor; or (ii) Cancelling this Agreement by delivering written Notice of such cancellation to Seller, in which event the Escrow Agent shall return the entire Deposit (i.e., to the extent that such Deposit is then being held by the Escrow Agent in cleared funds) and all interest accrued thereon to Purchaser, whereupon both Seller and Purchaser shall be released from all further obligations under this Agreement, except for those obligations which are expressly stated herein to survive termination of this Agreement.

4

(i)    Notwithstanding anything to the contrary contained herein, within five (5) business days following its receipt of the Endorsement or any other endorsement to the Commitment, (in any instance, the "Subject Endorsement"), but in no event later than the date of Closing (even if such date of Closing is less than five (5) business days following its receipt of the Subject Endorsement), (said five (5)-business day period with respect to any Subject Endorsement being referred to herein as the "New Title Defect Notice Period"), Purchaser may deliver to Seller a written Notice, (with respect to any Subject Endorsement, the "New Title Defect Notice"), of any title defect(s) appearing of record after the later of the effective date of the Commitment or the effective date of the most recent endorsement to the Commitment delivered by Seller to Purchaser prior to the Subject Endorsement itself, which title defect(s) are first shown by the Subject Endorsement, (with respect to any Subject Endorsement, each a "New Title Defect"). If Purchaser fails to deliver to Seller a New Title Defect Notice prior to the expiration of the New Title Defect Notice Period with respect to any Subject Endorsement, then all matters shown in the Subject Endorsement shall be deemed to be waived by Purchaser as title objections to Closing the transaction contemplated by this Agreement. If Purchaser does deliver to Seller a New Title Defect Notice prior to the expiration of the New Title Defect Notice Period with respect to any Subject Endorsement, then all matters shown in the Subject Endorsement but not specifically listed as New Title Defect(s) in such New Title Defect Notice shall be deemed to be waived by Purchaser as title objections to Closing the transaction contemplated by this Agreement, and Seller shall have until (and including) the date which is ten (10) days following its receipt of such New Title Defect Notice, but no later than the date of Closing, (the "New Title Response Date"), to deliver to Purchaser written Notice, (the "New Title Response"), specifying each alleged New Title Defect set forth in the New Title Defect Notice which Seller deems not to be a title defect (i.e., which Seller contends does not render title to the Realty other than as represented in this Agreement), and/or does not intend to cure (or cause to be cured) by the date of Closing, (collectively, the "Rejected New Title Defects"). If Purchaser shall deliver to Seller such a New Title Defect Notice specifying one or more New Title Defects prior to the expiration of the New Title Defect Notice Period, but Seller thereafter fails to deliver to Purchaser any New Title Response specifying one or more Rejected New Title Defects on or before the New Title Response Date, then Seller shall use commercially reasonable efforts to cause all such New Title Defects set forth in the New Title Defect Notice to be cured by the date of Closing (provided, however, that Seller shall not be required, under any circumstances, to remove by payment, bonding, or otherwise any lien against the Property or to bring suit to cure any New Title Defect or to buy-out or settle any claim or lien against the Property; except that Seller shall be required to cure all New Title Defects listed in the New Title Defect Notice which were caused by Seller; and Seller's obligation, if any, to pay up to $100,000 to cure any other title defects listed in the original Title Defect Notice, if any, as set forth elsewhere in this Agreement, shall also include and cover any other New Title Defect not caused by Seller and listed in the New Title Defect Notice); and in the event that Seller does not, as of the date of Closing, eliminate any or all such New Title Defects, then Purchaser shall have the option of either: (i) Closing the subject transaction on the scheduled date of Closing and accepting title to the Realty "as is" (inclusive of each New Title Defect) without reduction in the Purchase Price and without claim against Seller therefor; or (ii) Cancelling this Agreement by delivering written Notice of such cancellation to Seller on the scheduled date of Closing (but prior to consummation of such Closing), in which event the Escrow Agent shall return the entire Deposit (i.e., to the extent that such Deposit is then being held by the Escrow Agent in cleared funds) and all interest accrued thereon to Purchaser, whereupon both Seller and Purchaser shall be released from all further obligations under this Agreement, except for those obligations which are expressly stated herein to survive termination of this Agreement. If, on the other hand, Purchaser shall deliver to Seller such a New Title Defect Notice specifying one or more New Title Defects prior to the expiration of the New Title Defect Notice Period, and Seller thereafter does deliver to Purchaser a New Title Response specifying one or more Rejected New Title Defects on or before the New Title Response Date, then, if any one or more of such Rejected New Title Defects set forth in said New Title Response do, in fact, render title to the Realty other than as represented in this Agreement, Purchaser shall have until (and including) the date which is five (5) days following its receipt of such New Title Response, (the "New Title Cancellation Date"), to deliver to Seller written Notice of Purchaser's election to cancel this Agreement, (the "New Title Cancellation Notice"). In such event, if Purchaser does deliver a proper New Title Cancellation Notice to Seller on or before the New Title Cancellation Date, then the Escrow Agent shall return the entire Deposit (i.e., to the extent that such Deposit is then being held by the Escrow Agent in cleared funds) and all interest accrued thereon to Purchaser, whereupon both Seller and Purchaser shall be released from all further obligations under this Agreement, except for those obligations which are expressly stated herein to survive termination of this Agreement; whereas, if Purchaser fails to deliver such a proper New Title Cancellation Notice to Seller on or before the New Title Cancellation Date, then all Rejected New Title Defects shall be deemed to be waived by Purchaser as title objections to Closing the transaction contemplated by this Agreement, and Seller shall use commercially reasonable efforts to cause all New Title Defects set forth in the

New Title Defect Notice, other than the Rejected New Title Defects, to be cured by the date of Closing (provided, however, that Seller shall not be required, under any circumstances, to remove by payment, bonding, or otherwise any lien against the Property or to bring suit to cure any New Title Defect or to buy-out or settle any claim or lien against the Property; except that Seller shall be required to cure all New Title Defects listed in the New Title Defect Notice (other than the Rejected Title Defects) which were caused by Seller; and Seller's obligation, if any, to pay up to $100,000 to cure any other title defects listed in the original Title Defect Notice, if any, as set forth elsewhere in this Agreement, shall also include and cover any other New Title Defect not caused by Seller and listed in the New Title Defect Notice (other than the Rejected Title Defects)); and in the event that Seller does not, as of the date of Closing, eliminate any or all such New Title Defects (other than the Rejected Title Defects), then Purchaser shall have the option of either: (i) Closing the subject transaction on the scheduled date of Closing and accepting the title to the Realty "as is" (inclusive of each New Title Defect) without reduction in the Purchase Price and without claim against Seller therefor; or (ii) Cancelling this Agreement by delivering written Notice of such cancellation to Seller on the scheduled date of Closing (but prior to consummation of such Closing), in which event the Escrow Agent shall return the entire Deposit (i.e., to the extent that such Deposit is then being held by the Escrow Agent in cleared funds) and all interest accrued thereon to Purchaser, whereupon both Seller and Purchaser shall be released from all further obligations under this Agreement, except for those obligations which are expressly stated herein to survive termination of this Agreement.

5.    **Deliveries.** Within five (5) Business Days following the Effective Date of this Agreement, Seller shall deliver to Purchaser, at no cost to Purchaser, true, correct and complete copies of the following documents, items, materials, information and/or other data (to the extent that Seller has such documents, items, materials, information and/or other data in its possession), (collectively, the "**Initial Deliveries**"):

> (a)    Contracts, Etc. All contracts, arrangements, licenses, concessions, easements, service arrangements, employment contracts or agreements, brokerage agreements, and any and all other contracts or agreements, either recorded or unrecorded, written or oral, affecting the Property or any portion thereof, or the use thereof, and to which Seller is a party or otherwise bound, (the "**Contracts**"), a list of which Contracts is set forth on **Exhibit C** attached to this Agreement and made a part hereof, and Seller shall terminate all Contracts as of Closing other than those noted as "NOT TO BE TERMINATED" on **Exhibit C**; and

> (b)    Other Items. Those items set forth on **Exhibit D** attached to this Agreement and made a part hereof.

Upon further reasonable request made by Purchaser to Seller prior to the expiration of the Inspection Period, Seller shall deliver to Purchaser, at no cost to Purchaser, any and all other reasonably requested documents, items, materials, information and/or other data pertinent to the Property (to the extent that Seller has such documents, items, materials, information and other data in its possession), (collectively, the "**Additional Deliveries**"; all Initial Deliveries and Additional Deliveries being collectively referred to herein as the "**Deliveries**"). In the event that this Agreement shall be terminated for any reason whatsoever or no reason at all, Purchaser shall, within two (2) Business Days following such termination, (a) return to Seller all Deliveries delivered by Seller to Purchaser pursuant to this Paragraph 5 and all copies thereof, and (b) provide to Seller copies of all engineering, environmental, soil, structural and other third-party reports and surveys obtained or possessed by Purchaser with respect to the Property or any portion thereof without any representation, warranty or liability (the provisions of this sentence to expressly survive the termination of this Agreement).

6.    **Termination Fee.** The Purchaser shall be entitled to, in addition to a return of the Deposit, a termination fee in the event that a court of competent jurisdiction does not enter a Court Sale Order (as define in Section 8(b)) and Seller completes an Alternative Transaction (as defined below) as liquidated damages as follows: (a) if in the bankruptcy court (i) a termination fee in the amount of $300,000.00; and (ii) expense reimbursement as reimbursement of Purchaser's reasonable, unpaid out-of-pocket costs and expenses, including reasonable attorneys' fees incurred by Purchaser in connection with the negotiation, execution or consummation of this Agreement and the transactions contemplated hereby (including, without limitation, the performance of due diligence) which shall not exceed $200,000.00 in the aggregate ("Expense Reimbursement"); and (b) if in a court of competent jurisdiction other than the bankruptcy court: (i) a termination fee in the amount of $150,000.00; and (ii) Expense Reimbursement; provided, however, if Seller is compelled to complete an Alternate Transaction by a court of competent jurisdiction

(other than bankruptcy court) and the total aggregate funds received from such Alternative Transaction (whether the transfer encompasses separate transfer of individual units or all units as one transaction) are insufficient to pay the termination fee in the amount of $150,000.00 and Expense Reimbursement in full, Seller shall only be responsible for liquidated damages to Purchaser for any amounts received over the Purchase Price and up to payment of the termination fee in the amount of $150,000.00 and Expense Reimbursement. "Alternative Transaction" shall mean the sale, transfer or other disposition, directly or indirectly, including through an asset sale, share sale, merger, amalgamation, foreclosure or other transaction approved by any Florida state court, or any asset sale, plan of reorganization or plan of liquidation approved by the U.S. bankruptcy court, or resulting in an auction sale, of any material portion of the assets or equity interests of the Seller, in a single transaction or a series of transactions, with one or more persons other than Purchaser and/or its affiliates. The termination fee in and the Expense Reimbursement in this Section 6 shall be paid on the closing of an Alternative Transaction. The provisions of this Paragraph 6 shall survive the Closing or earlier termination of this Agreement.

7.      **Inspection Period.** Purchaser shall have from the Effective Date of this Agreement until the date which is twenty (20) days following the Effective Date of this Agreement, (the "**Inspection Period**"), to (a) examine the Deliveries, and (b) make such physical, zoning, land use, environmental and other examinations, inspections, tests, studies and investigations of the Property or the use or operation thereof which Purchaser, in Purchaser's sole discretion, may determine to make, (collectively, "**Inspections**"). Purchaser, its designated contractors, and their respective designated subcontractors, principals, employees and other agents, (collectively, "**Purchaser Inspecting Parties**"), shall have the right, during the Inspection Period, to enter upon the Realty at reasonable times, upon not less than one (1) Business Days' advance Notice to Seller in each instance, and (if Seller shall so elect in any given instance) accompanied by a representative of Seller as designated by Seller, for purposes of conducting any Inspections thereon. During the course of any Inspections, or otherwise while located upon the Realty, no Purchaser Inspecting Party shall disturb the peaceful enjoyment of a Unit or any Common Elements by any owner, occupant or guest of any Unit. Purchaser agrees to and shall indemnify, defend and hold harmless Seller and its officers, directors, principals, members, employees and other agents from and against any and all liabilities, damages, claims, costs, fees and expenses whatsoever (including, without limitation, reasonable attorneys' fees and court costs at trial and all appellate levels) arising out of or resulting from any such Inspections conducted by or at the direction of Purchaser and/or any of the other Purchaser Inspecting Parties (the provisions of this sentence to expressly survive the Closing and any earlier termination of this Agreement). In the event Purchaser is not satisfied with any or all of the Deliveries and/or the results of any or all of the Inspections, for any reason or for no reason, then, in Purchaser's sole and absolute discretion, Purchaser may cancel this Agreement by delivering written Notice of such cancellation to Seller at any time prior to the expiration of the Inspection Period, in which event the Escrow Agent shall (i) return the Initial Deposit to Purchaser (i.e., to the extent that such Initial Deposit is then being held by the Escrow Agent in cleared funds), (ii) release the Nonrefundable Deposit to Seller, to be retained by Seller for its own account (i.e., to the extent that such Nonrefundable Deposit is then being held by the Escrow Agent in cleared funds), and (iii) release all interest accrued on the Deposit (if any) to Purchaser, whereupon both Seller and Purchaser shall be released from all further obligations under this Agreement except for those obligations which are expressly stated herein to survive termination of this Agreement; provided, however, that if, prior to the end of the Inspection Period, Purchaser shall either terminate this Agreement pursuant to any right to do so granted to Purchaser under Paragraph 4 hereinabove, or terminate this Agreement due to any default by Seller under this Agreement pursuant to any right to do so granted to Purchaser under Paragraph 10 hereinbelow (it being expressly understood and agreed that Seller shall in no event be deemed to be in default under this Agreement due to the fact that any Condition Precedent has not been satisfied or waived, or otherwise in connection with any Condition Precedent not having been satisfied or waived), then the Escrow Agent shall return both Initial Deposit and the Nonrefundable Deposit to Purchaser (i.e., to the extent that such Initial Deposit and Nonrefundable Deposit is then being held by the Escrow Agent in cleared funds). If, at the time that Purchaser shall cancel this Agreement by delivering written Notice of such cancellation to Seller prior to the expiration of the Inspection Period in accordance with the provisions of this paragraph, the Escrow Agent shall be holding less than the aggregate of the Initial Deposit and the Nonrefundable Deposit in cleared funds, then the first $250,000.00 of all cleared funds being held by said Escrow Agent hereunder shall be applied by Escrow Agent toward the Nonrefundable Deposit, with the remainder of any such clear funds to be applied by Escrow Agent toward the Initial Deposit and all accrued interest on the Deposit (if any).

8.      **Conditions Precedent.** Each of Seller's obligation and Purchaser's obligation to close the transaction provided for in this Agreement shall be subject to the following conditions precedent to Closing, (the "**Condition Precedent**"):

7

(a)    <u>No Timeshare Regime</u>. As of the date of Closing, (i) the Property shall be no longer be encumbered by any of the timeshare provisions set forth in the Declaration (whether by way of the automatic sunsetting/expiration of such provisions or otherwise), and (ii) the Property shall not be encumbered by any other timeshare regime or plan. Seller shall use its best efforts to cause both such events to timely occur.

(b)    <u>Court Order.</u> As of the date of Closing, Seller shall have obtained from a court of competent jurisdiction before which an action for partition of the Realty has been filed as of the Effective Date of this Agreement, or Seller shall have obtained from any court of competent jurisdiction, including without limitation bankruptcy court, resulting from an action that may be filed after the Effective Date of this Agreement, in connection with the sunsetting/expiration of the timeshare provisions set forth in the Declaration, a final, non-appealable order, whether by virtue of an action of partition, or pursuant to 11 U.S.C. §§ 363(b), (f) and (h), Bankruptcy Rule 6004(a), (b), (e) and (f), and Local Bankruptcy Rule 6004-1, including without limitation final non appealable judgment in an action in which summons has been served upon named defendants in such action by normal service of process and/or publication based upon court approval, and authorizing the sale of the Realty to Purchaser in a private sale by the Association, whether or not acting through a trustee or other person or entity appointed by said court to act on behalf of said Association (i.e., without joinder of any of the owner(s) of the Units), (the "<u>Court Sale Order</u>"). Seller and Purchaser shall act in good faith and put forth its best efforts in trying to obtain such Court Sale Order during the period commencing upon the Effective Date of this Agreement and ending upon the earlier of (i) the date on which Seller shall actually obtain such Court Sale Order, and (ii) the date on which this Agreement shall be terminated in accordance with its terms.

(c)    <u>No Challenge to Sale</u>. As of the date of Closing, there shall be no legal action pending before any court of competent jurisdiction in which the sale of the Property from Seller to Purchaser is being challenged or contested.

Any right that Purchaser may have to terminate this Agreement in the event that any or all of the foregoing Conditions Precedent have not been satisfied (or otherwise waived by Purchaser) as of the date of Closing is set forth in Paragraph 14 hereinbelow.

9.    <u>Seller's Representations</u>. Seller represents and warrants to Purchaser and covenants and agrees with Purchaser as follows, as of both the Effective Date of this Agreement and as of the date of Closing:

(a)    <u>Contracts</u>. Seller has not entered into any contracts, arrangements, licenses, concessions, easements, service arrangements, employment contracts or agreements, brokerage agreements, or other contracts or agreements, either recorded or unrecorded, written or oral, affecting the Property or any portion thereof, or the use thereof, other than the Contracts.

(b)    <u>Governmental Liens, Violations, Lawsuits, Condemnation</u>. Seller has no notice or knowledge of any of the following except as otherwise disclosed to Purchaser via the Deliveries: (i) Any pending improvement liens to be made by any governmental authority with respect to the Property; (ii) Any violations of building codes and/or zoning ordinances or other governmental regulations with respect to the Property; (iii) Any pending or threatened lawsuits with respect to the Property; or (iv) Any pending or threatened condemnation proceedings with respect to the Property.

(c)    <u>Compliance with Laws</u>. Prior to Closing, Seller shall comply with all laws, rules, regulations, and ordinances of all governmental authorities having jurisdiction over the Property.

8

(d)    Seller Authority. Seller is a corporation duly organized, validly existing and in good standing under the laws of the State of Florida. The execution, delivery and performance of this Agreement by Seller have been duly authorized and no consent of any other person or entity to such execution, delivery and performance is required to render this document a valid and binding instrument enforceable against Seller in accordance with its terms, except for the Court Sale Order. Neither the execution of this Agreement nor the consummation of the transactions contemplated hereby will: (i) result in a breach of, or default under, any agreement to which Seller is a party or by which the Property is bound, or (ii) violate any restrictions to which Seller is subject.

(e)    Hazardous Substances. Seller has not received any notice from any governmental authority regarding the presence of any Hazardous Substance, any present or past generation, recycling, reuse, sale, storage, handling, transport and/or disposal of any Hazardous Substance or any failure to comply with any applicable local, state or federal environmental laws, regulations, ordinances or administrative or judicial orders relating to the generation, recycling, reuse, sale, storage, handling, transport and/or disposal of any Hazardous Substance. As used herein, the term **"Hazardous Substance"** means any substance or material defined or designated as a hazardous or toxic waste material or substance, or other similar term by any federal, state or local environmental statute, regulation or ordinance presently or hereinafter in effect, as such statute, regulation or ordinance may be amended from time to time.

(f)    Non-Foreign Person. In the event that Seller is deemed a "foreign person" within the meaning of the United States tax laws and to which reference is made in Internal Revenue Code Section 1445(b)(2), all legally required federal withholding(s) shall be collected at Closing.

The provisions of this Paragraph 9 shall survive the Closing for a period of six (6) months commencing upon the date of Closing.

10.    **Default Provisions.** In the event of a default by Purchaser under this Agreement, Seller, at its option, shall have the right to terminate this Agreement (by delivering written Notice of such termination to Purchaser), in which event the Escrow Agent shall release to Seller, to be retained by Seller for its own account , the entire Deposit (i.e., to the extent that such Deposit is then being held by the Escrow Agent in cleared funds), together with all interest accrued thereon (if any), as agreed and liquidated damages for said breach, and as Seller's sole and exclusive remedy for default of Purchaser, whereupon both Seller and Purchaser shall be released from all further obligations under this Agreement except for those obligations which are expressly stated herein to survive termination of this Agreement. In the event of a default by Seller under this Agreement (it being expressly understood and agreed that Seller shall in no event be deemed to be in default under this Agreement due to the fact that any Condition Precedent, except the Condition Precedent set forth in Section 8(b), has not been satisfied or waived, or otherwise in connection with any Condition Precedent, except the Condition Precedent set forth in Section 8(b), not having been satisfied or waived), Purchaser at its option shall have the right to: (a) Terminate this Agreement (by delivering written Notice of such termination to Seller), in which event the Escrow Agent shall return to Purchaser the entire Deposit (i.e., to the extent that such Deposit is then being held by the Escrow Agent in cleared funds), together with all interest accrued on the Deposit (if any); whereupon both Seller and Purchaser shall be released from all further obligations under this Agreement except for those obligations which are expressly stated herein to survive termination of this Agreement; or, alternatively (b) Seek specific performance of Seller's obligations hereunder. Notwithstanding the foregoing, in the event of a default by either party hereto of any obligations, indemnities, representations or warranties which specifically survive Closing, then the non-defaulting party shall be entitled to seek any legal redress permitted by law or equity.

11.    **Prorations.** Real estate and personal property taxes attributable to the Property (or any portion thereof) shall be prorated as of the date of Closing. In the event any such taxes for the year of Closing are unknown as of the date of Closing, the tax proration will be based upon the taxes for the prior year (with application of the maximum available discount); and at the request of either party made to the other party at any time after the actual tax bill for the year of Closing is available and the actual amount of taxes is known, but no later than the date which is six

9

(6) months following the date of Closing, said taxes for the year of Closing shall be reprorated and adjusted by and between Seller and Purchaser. The provisions of this Paragraph 11 shall expressly survive the Closing.

12.     **Improvement Liens.** Certified, confirmed or ratified special assessment liens for governmental improvements as of the date of Closing, if any, shall be paid in full by Seller, and pending special assessment liens for governmental improvements as of the date of Closing shall be assumed by the Purchaser; provided, however, that if a certified, confirmed or ratified special assessment lien for governmental improvements is payable in installments, then Seller will pay all installments due and payable on or before the date of Closing (with any installment for any period extending beyond the date of Closing to be prorated), and Purchaser will assume all installments that become due and payable after the date of Closing. Seller hereby discloses to Purchaser that the Realty is currently subject to a Town special assessment which will continue to be assessed over the course of the next few decades.

13.     **Closing Costs.** The parties hereto shall bear the following costs:

(a)     Purchaser shall be responsible for payment of the following: (i) The cost of the Survey; (ii) Any and all costs and expenses of Inspections performed by or at the direction of Purchaser and/or any of the other Purchaser Inspecting Parties and reports issued in connection therewith; (iii) The cost of recording the Deed (as hereinafter defined); and (iv) Any and all costs and expenses, including, without limitation, all documentary stamp taxes, intangible taxes and mortgagee title insurance premiums, incurred in connection with any mortgage financing obtained by Purchaser in connection with the subject transaction.

(b)     Seller shall be responsible for payment of the following: (i) The cost of examining title and obtaining any title insurance policy update or report on the Property, and the premiums and any other related fees and costs for any owner's title insurance policy (provided, however, that Purchaser shall be responsible for payment of any premiums on any endorsements to such owner's title insurance policy as may be requested or required by Purchaser), as well as the costs of any county and/or municipal lien searches; (ii) The documentary stamp taxes and surtax (if any) due on the Deed; and (iii) The recording costs on documents necessary to clear title.

(c)     Each party hereto shall pay its own legal fees except as provided in Paragraph 23, subparagraph (c) hereinbelow.

14.     **Closing.** Subject to other provisions of this Agreement for extension of the date of Closing, the closing of the transaction contemplated by this Agreement, (the "**Closing**"), shall be held on the date which is the first day of any Seller Quarter (as hereinafter defined) to fall on or after the date which is thirty (30) days following the expiration of the Inspection Period; provided, however, that if such date shall fall on a day which is not a Business Day, then the actual Closing shall occur on the next Business Day thereafter. For purposes hereof, the term "**Seller Quarter**" shall mean and include the 13-week period commencing Monday, July 5, 2021 and ending at the end of the day on Sunday, October 3, 2021, and each consecutive 13-week period thereafter. For example, if the Inspection Period shall expire on March 27, 2021, then the date of Closing shall be July 6, 2021 (i.e., because July 5, 2021 is not a Business Day); whereas, if the Inspection Period shall expire on September 9, 2021, then the date of Closing shall be January 3, 2022. However, notwithstanding anything to the contrary contained in this Agreement, if the Contingency Satisfaction Date (as hereinafter defined) has not yet occurred on or before the aforesaid scheduled date of Closing, then such date of Closing shall be extended until the date which is the first day of any Seller Quarter to fall on or after the date which is thirty (30) days following the Contingency Satisfaction Date; provided, however, that if such extended date of Closing shall fall on a day which is not a Business Day, then the actual Closing shall occur on the next Business Day thereafter. For example, if the Inspection Period shall expire on March 27, 2021, thereby causing the original scheduled date of Closing to be July 6, 2021 pursuant to the provisions above, but the Contingency Satisfaction Date does not occur until August 14, 2021, then the date of Closing would be extended to October 4, 2021. However, notwithstanding anything to the contrary contained in this Agreement, if the Contingency Satisfaction Date shall not occur on or before the date which is thirty six (36) months following the expiration of the Inspection Period, then either Seller or Purchaser may terminate this Agreement by providing written Notice of such termination to the other party at any time following the expiration of such 36-month period but no later than the ultimate Contingency Satisfaction Date, in which event the Escrow Agent shall return to Purchaser the Initial Deposit and the

Additional Deposit (i.e., to the extent that such Initial Deposit and Additional Deposit are then being held by the Escrow Agent in cleared funds), together with all interest accrued on the Deposit (if any), and the Escrow Agent shall release to Seller, to be retained by Seller for its own account, the Nonrefundable Deposit (i.e., to the extent that such Nonrefundable Deposit is then being held by the Escrow Agent in cleared funds), whereupon both Seller and Purchaser shall be released from all further obligations under this Agreement except for those obligations which are expressly stated herein to survive termination of this Agreement. If, at the time that either Seller or Purchaser shall terminate this Agreement due to the Contingency Satisfaction Date not having occurred on or before the date which is thirty six (36) months following the expiration of the Inspection Period in accordance with the provisions of the immediately preceding sentence, the Escrow Agent shall be holding less than the aggregate of the entire Deposit in cleared funds, then the first $250,000.00 of all cleared funds being held by said Escrow Agent hereunder shall be applied by Escrow Agent toward the Nonrefundable Deposit, with the remainder of any such clear funds to be applied by Escrow Agent toward the Initial Deposit, the Additional Deposit and all accrued interest on the Deposit (if any). For purposes hereof, the term "**Contingency Satisfaction Date**" shall mean and refer to the date on which the last of each of the Conditions Precedent has been satisfied or otherwise waived by both Seller and Purchaser. The Closing shall take place at the offices of the attorneys for Seller, EISINGER LAW, located at 4000 Hollywood Boulevard, Suite 265-S, Hollywood, Florida 33021; provided, however, that upon mutual agreement of Seller and Purchaser, the Closing may be conducted at a different location or otherwise via the mail. At the Closing, the following actions shall be taken and the following deliveries shall be made, all of which shall be deemed to have occurred simultaneously and no one of which shall be deemed completed until all have been completed:

- (a) **Special Warranty Deed.** Seller shall deliver to Purchaser an original Special Warranty Deed, in reasonable form, executed by Seller (or by the trustee or other court-appointed person or entity, acting on behalf of the Association, pursuant to the Court Sale Order, as applicable; but in any event consistent with any requirements of the Court Sale Order and/or the Title Company), conveying fee simple title to the Realty to Purchaser, subject to Permitted Exceptions, (the "**Deed**").

- (b) **Bill of Sale.** Seller shall deliver to Purchaser an original Bill of Sale, in reasonable form, executed by Seller (or by the trustee or other court-appointed person or entity, acting on behalf of the Association, pursuant to the Court Sale Order, as applicable; but in any event consistent with any requirements of the Court Sale Order), conveying to Purchaser the Personal Property (other than the Excluded Property) with a warranty of title and authority to convey.

- (c) **Seller Affidavit.** Seller shall deliver to Purchaser an original Seller Affidavit, in reasonable form, executed by Seller (or by the trustee or other court-appointed person or entity, acting on behalf of the Association, pursuant to the Court Sale Order, as applicable; but in any event consistent with any requirements of the Court Sale Order and/or the Title Company), sufficient to allow issuance of an owner's title insurance policy to and in favor of Purchaser with respect to the Realty without exception for possible lien claims of mechanics, laborers and materialmen, without exception for parties in possession, and the deletion of other standard title exceptions (including, without limitation, the "GAP" exception).

- (d) **Evidence of Authority and Good Standing.** Seller shall deliver to the Title Company appropriate evidence of the formation and good standing of Seller (or the trustee or other court-appointed person or entity, acting on behalf of the Association, pursuant to the Court Sale Order, as applicable; but in any event consistent with any requirements of the Court Sale Order and/or the Title Company), as may be reasonably required by the Title Company, as well as originals of such documents and resolutions as may be reasonably required by the Title Company so as to evidence the authority of the person signing any Deed and/or other documents on behalf of Seller (or the trustee or other court-appointed person or entity, acting on behalf of the Association, pursuant to the Court Sale Order, as applicable) at Closing and/or as may be reasonably required by the Title Company in order to satisfy any requirements set forth in Schedule B-1 of the Commitment. Purchaser shall deliver to the Title Company appropriate evidence of the formation and

11

good standing of Purchaser as may be reasonably required by the Title Company, as well as originals of such documents and resolutions as may be reasonably required by the Title Company so as to evidence the authority of the person signing any mortgage and/or other documents on behalf of Purchaser at Closing and/or as may be reasonably required by the Title Company in order to satisfy any requirements set forth in Schedule B-1 of the Commitment.

(e) Closing Statement. Seller (or the trustee or other court-appointed person or entity, acting on behalf of the Association, pursuant to the Court Sale Order, as applicable) and Purchaser shall execute and exchange with each other originals of a closing statement, as prepared by the Title Agent and approved by both Seller (or the trustee or other court-appointed person or entity, acting on behalf of the Association, pursuant to the Court Sale Order, as applicable) and Purchaser in advance of Closing, provided that such closing statement shall accurately reflect the agreement(s) of Seller and Purchaser under this Agreement.

(f) Other Documentation. Seller (or the trustee or other court-appointed person or entity, acting on behalf of the Association, pursuant to the Court Sale Order, as applicable) and Purchaser shall execute and exchange with each other such other documents as may be reasonable and necessary in the opinion of said parties or their respective legal counsel in order to consummate and close the purchase and sale transaction contemplated herein pursuant to the terms and provisions of this Agreement. In the event that this transaction requires the completion or submission of a FinCEN Currency Transaction Report, Purchaser and Purchaser's legal counsel shall fully cooperate with Seller's legal counsel in providing any and all information require for same.

(g) Payment of Purchase Price. The Escrow Agent shall release the Deposit to Seller (or the trustee or other court-appointed person or entity, acting on behalf of the Association, pursuant to the Court Sale Order, as applicable), and the balance of the Purchase Price, subject to prorations and adjustments as set forth elsewhere in this Agreement and reflected on the closing statement, shall be paid by Purchaser to Seller (or the trustee or other court-appointed person or entity, acting on behalf of the Association, pursuant to the Court Sale Order, as applicable) in immediately available funds by wire transfer.

(h) Delivery of Possession. Seller (or the trustee or other court-appointed person or entity, acting on behalf of the Association, pursuant to the Court Sale Order, as applicable) will deliver to Purchaser possession and occupancy of the Realty free of any parties/tenants in possession.

15. Brokers. Seller shall be responsible for payment of a real estate brokerage commission in an amount equal to One Percent (1.0%) of the Purchase Price (the "Seller's Brokerage Commission") to Share Trust, Inc. (the "Seller's Broker") at Closing in connection with the transaction contemplated by this Agreement; and Seller shall indemnify, defend and hold harmless Purchaser, and said Purchaser's members, other principals, managers, officers, directors, agents and representatives, from and against any and all liabilities, damages, claims, costs, fees and expenses whatsoever (including reasonable attorney's fees and court costs at trial and all appellate levels) with respect to (i) any claim for the Seller's Brokerage Commission made by the Seller's Broker, and/or (ii) any claim for any other brokerage commissions, compensation and/or other fees due to any other broker, salesman or finder claiming to have dealt through or on behalf of Seller in connection with the transaction contemplated by this Agreement (whether pursuant to a separate agreement between Seller and such other broker, salesman or finder, or otherwise). Purchaser represents to Seller that Purchaser has not engaged or dealt with any broker, salesman or other finder in connection with the transaction contemplated by this Agreement other than Seller's Broker; and Purchaser shall be responsible for all brokerage commissions, compensation and other fees due to any broker, salesman or finder claiming to have dealt through or on behalf of Purchaser in connection with the transaction contemplated by this Agreement (whether pursuant to a separate agreement between Purchaser and such broker, salesman or finder, or otherwise), except for the Seller's Brokerage Commission due to the Seller's Broker at Closing; and Purchaser shall indemnify, defend and hold harmless Seller, and said Seller's members, other principals, managers, officers, directors, agents and representatives, from and against any and all liabilities, damages, claims, costs, fees and expenses whatsoever (including reasonable

12

attorney's fees and court costs at trial and all appellate levels) with respect to any such claim for brokerage commissions, compensation and/or other fees of any broker, salesman or finder claiming to have dealt through or on behalf of Purchaser in connection with the transaction contemplated by this Agreement (whether pursuant to a separate agreement between Purchaser and such other broker, salesman or finder, or otherwise), except with respect to the Seller's Brokerage Commission due to Seller's Broker at Closing. The provisions of this paragraph shall expressly survive the Closing or any earlier termination of this Agreement.

16.     **Assignability.** Purchaser shall be entitled to assign its rights hereunder in whole or in part; provided, however, that in the event of any such assignment, Purchaser (i.e., the original named Purchaser under this Agreement) shall not be released from any or all of its obligations hereunder, but, rather, Purchaser (i.e., the original named Purchaser under this Agreement) shall remain fully bound by the terms and conditions of this Agreement (i.e., jointly and severally together with Purchaser's assignee). Any assignee of Purchaser (i.e., the original named Purchaser under this Agreement), or any subsequent assignee, shall not be permitted to assign its rights hereunder in whole or in part without the prior written consent of Seller in each instance, which consent may be withheld, conditioned or delayed by Seller for any reason whatsoever.

17.     **Escrow Agent.** The Escrow Agent shall not be liable for any actions taken by said Escrow Agent in good faith, but only for its gross negligence or willful misconduct. The parties shall indemnify, defend and hold harmless the Escrow Agent from and against any and all losses, liabilities, claims, damages, injuries, costs, fees and expenses whatsoever (including reasonable attorney's fees and court costs at trial and all appellate levels) that the Escrow Agent may incur or to which the Escrow Agent may be exposed in its capacity as escrow agent hereunder except as a result of the Escrow Agent's gross negligence or willful misconduct. If there be any dispute as to disposition of any proceeds held by the Escrow Agent pursuant to the terms of this Agreement, the Escrow Agent is hereby authorized to interplead said amount or the entire proceeds with any court of competent jurisdiction and thereby be released from all obligations hereunder. The Escrow Agent shall not be liable for any failure of the depository in which any or all of the Deposit shall be deposited. The Escrow Agent shall not be required to hold the Deposit in an interest-bearing account. The Escrow Agent shall be deemed a third-party beneficiary of this Agreement with respect to the provisions of this Paragraph 17. The provisions of this paragraph shall expressly survive the Closing or earlier termination of this Agreement.

18.     **Notices.** Any and all notices, demands, requests, consents, approvals or other communications, (collectively, "**Notices**"), required or permitted to be given under this Agreement, or which are given with respect to this Agreement, shall be in writing and shall be deemed to have been given if delivered by hand, sent by a nationally recognized overnight delivery or courier company (such as Federal Express), or mailed by certified or registered U.S. mail, return receipt requested, in a postage prepaid envelope, and addressed as follows (or to such other address any party hereto shall have specified most recently by a Notice given to the other party hereto in the manner required hereunder):

13

If to the Seller at:          Palm Beach Resort and Beach Club Condominium Association, Inc.
                              c/o Lemonjuice Solutions
                              7041 Grand National Dr., #230
                              Orlando, FL 32819
                              Attn: Scott MacGregor, Senior VP, COO

With a copy to:               Eisinger Law
                              4000 Hollywood Boulevard, Suite 265 South
                              Hollywood, FL 33021
                              Attn: Alessandra Stivelman, Esq.

If to the Purchaser at:       Copperline Partners, LLC
                              1801 South Australian Avenue
                              West Palm Beach, FL 33409
                              Attn: Richard Schlesinger, Managing Director

With a copy to:               Greenberg Traurig, P.A.
                              777 S. Flagler Drive, Suite 300 East
                              West Palm Beach, FL 33401
                              Attn: David M. Layman, Esq.

Notices personally delivered or sent by a nationally recognized overnight delivery or courier company shall be deemed given/delivered/received on the date of delivery, and Notices mailed by certified or registered U.S. mail, return receipt requested, shall be deemed given/delivered/received three (3) days after deposit in the U.S. mails.

19.    **Risk of Loss.** The Property shall be conveyed to Purchaser in the same condition as on the Effective Date of this Agreement, ordinary wear and tear, damage caused by casualty, and Excluded Property excepted. In the event that the Property or any portion thereof is taken by eminent domain prior to Closing, Purchaser shall have the option of either: (a) Cancelling this Agreement by delivering written Notice of such cancellation to Seller, in which event the Escrow Agent shall return to Purchaser the Initial Deposit and the Additional Deposit (i.e., to the extent that such Initial Deposit and Additional Deposit are then being held by the Escrow Agent in cleared funds), together with all interest accrued on the Deposit (if any), and the Escrow Agent shall release to Seller, to be retained by Seller for its own account, the Nonrefundable Deposit (i.e., to the extent that such Nonrefundable Deposit is then being held by the Escrow Agent in cleared funds), whereupon both Seller and Purchaser shall be released from all further obligations under this Agreement, except for those obligations which are expressly stated herein to survive termination of this Agreement. If, at the time that Purchaser shall cancel this Agreement due to the Property or any portion thereof having been taken by eminent domain prior to Closing in accordance with the provisions of the immediately preceding sentence, the Escrow Agent shall be holding less than the aggregate of the entire Deposit in cleared funds, then the first $250,000.00 of all cleared funds being held by said Escrow Agent hereunder shall be applied by Escrow Agent toward the Nonrefundable Deposit, with the remainder of any such clear funds to be applied by Escrow Agent toward the Initial Deposit, the Additional Deposit and all accrued interest on the Deposit (if any); or (b) Proceeding with Closing, in which case Purchaser shall be entitled to all condemnation awards and settlements. In the event that the Improvements or a material portion thereof are damaged or destroyed by fire or other casualty prior to Closing, then Purchaser shall have the option of either: (i) Cancelling this Agreement by delivering written Notice of such cancellation to Seller, in which event the Escrow Agent shall return to Purchaser the Initial Deposit and the Additional Deposit (i.e., to the extent that such Initial Deposit and Additional Deposit are then being held by the Escrow Agent in cleared funds), together with all interest accrued on the Deposit (if any), and the Escrow Agent shall release to Seller, to be retained by Seller for its own account, the Nonrefundable Deposit (i.e., to the extent that such Nonrefundable Deposit is then being held by the Escrow Agent in cleared funds), whereupon both Seller and Purchaser shall be released from all further obligations under this Agreement, except for those obligations which are expressly stated herein to survive termination of this Agreement. If, at the time that Purchaser shall cancel this Agreement due to the Improvements or a material portion thereof having been damaged or destroyed by fire or other casualty prior to Closing in accordance with the provisions of the immediately preceding sentence, the Escrow Agent shall be holding less than the aggregate of the entire Deposit in cleared funds, then the first $250,000.00 of all cleared funds being held by said Escrow Agent hereunder shall be applied by Escrow Agent toward the Nonrefundable Deposit, with the remainder of any such clear funds to be applied by Escrow Agent toward the Initial Deposit, the Additional Deposit

14

and all accrued interest on the Deposit (if any); or (ii) Proceeding with Closing, in which case Purchaser shall be entitled to, and to receive for its own account, all insurance proceeds (if any) which shall be paid under any casualty insurance policy maintained by Seller with respect to the Property in connection with any claim made thereunder for the subject casualty, and the Purchase Price shall be reduced by an amount equal to the amount of any deductible withheld by the subject casualty insurance carrier with respect to such claim (to the extent that such deductible shall not be paid by Seller itself prior to Closing); provided, however, that in the event only a nonmaterial portion of the Improvements (i.e., a value of $250,000 or less) is damaged or destroyed by fire or other casualty prior to Closing, then Purchaser shall be required to proceed with Closing, but Purchaser shall still be entitled to, and to receive for its own account, all insurance proceeds (if any) which shall be paid under any casualty insurance policy maintained by Seller with respect to the Property in connection with any claim made thereunder for the subject casualty, and the Purchase Price shall be reduced by an amount equal to the amount of any deductible withheld by the subject casualty insurance carrier with respect to such claim (to the extent that such deductible shall not be paid by Seller itself prior to Closing).

20.     **Radon Gas**. RADON IS A NATURALLY OCCURRING RADIOACTIVE GAS THAT, WHEN IT HAS ACCUMULATED IN A BUILDING IN SUFFICIENT QUANTITIES, MAY PRESENT HEALTH RISKS TO PERSONS WHO ARE EXPOSED TO IT OVER TIME. LEVELS OF RADON THAT EXCEED FEDERAL AND STATE GUIDELINES HAVE BEEN FOUND IN BUILDINGS IN FLORIDA. ADDITIONAL INFORMATION REGARDING RADON AND RADON TESTING MAY BE OBTAINED FROM YOUR COUNTY PUBLIC HEALTH UNIT. [NOTE: THIS PARAGRAPH IS PROVIDED FOR INFORMATIONAL PURPOSES PURSUANT TO SECTION 404.056(8), FLORIDA STATUTES, (1988).]

21.     **Disclaimer**. Except as and to the extent expressly provided to the contrary in this Agreement, including, without limitation, any representations and warranties made by Seller herein and in any closing documents delivered by Seller at or before Closing: (a) Seller makes and has made no representation or warranty, express or implied, concerning any portion of the Property, its condition, the use to which it may be put, its suitability for any purpose, any environmental matters, or any other thing or matter directly or indirectly related thereto; (b) Purchaser is responsible for determining that the condition of the Property is satisfactory to Purchaser; (c) Purchaser shall purchase and accept every portion of the Property in its "AS IS" "WHERE IS" condition without requiring any action, expense or other thing or matter on the part of Seller to be paid or performed and, upon acceptance of the Deed at Closing, Purchaser shall be conclusively deemed to have accepted the Property in its "AS IS" "WHERE IS" condition; (d) Seller makes and has made no representation or warranty, express or implied, as to the reliability or accuracy of any information or reports provided to Purchaser which are or were produced by a third party, it being expressly understood that verification of the accuracy of such information or reports is the responsibility of Purchaser; and (e) SELLER DISCLAIMS ANY WARRANTIES WITH RESPECT TO THE PROPERTY, INCLUDING, BUT NOT LIMITED TO, ANY COMMON LAW IMPLIED WARRANTIES OF FITNESS FOR A PARTICULAR PURPOSE, MERCHANTABILITY, OR HABITABILITY. The provisions of this paragraph shall expressly survive Closing or the earlier termination of this Agreement.

22.     **Continued Marketing**. During the period commencing upon the Effective Date of this Agreement and ending upon the expiration of the Inspection Period, Seller, in Seller's sole discretion, shall be permitted to (a) negotiate with and/or entertain or accept offers from any third party with respect to the sale or other conveyance of the Property (or any portion thereof), and/or (b) enter into any "back-up" or "contingency" contract(s) with any third party(ies) with respect to the sale or other conveyance of the Property (or any portion thereof).

23.     **Miscellaneous**.

        (a)     This Agreement shall be construed and governed in accordance with the laws of the State of Florida. All of the parties to this Agreement have participated fully in the negotiation and preparation hereof; and, accordingly, this Agreement shall not be more strictly construed against any one of the parties hereto. The sole jurisdiction and venue for any action or proceeding based upon, arising from, or related to, the subject matter of this Agreement shall lie in Palm Beach County, Florida. The provisions of this paragraph shall expressly survive the Closing or any earlier termination of this Agreement.

15

(b) In the event any term or provision of this Agreement be determined by appropriate judicial authority to be illegal or otherwise invalid, such provision shall be given its nearest legal meaning or be construed as deleted as such authority determines, and the remainder of this Agreement shall be construed to be in full force and effect. The provisions of this paragraph shall expressly survive the Closing or any earlier termination of this Agreement.

(c) In the event an arbitration, lawsuit, action or other proceeding is brought by any party under this Agreement to enforce any of its terms, or in any appeal therefrom, the prevailing party shall be entitled to reasonable attorneys' fees to be fixed by the arbitrator, trial court, and/or appellate court as the case may be. The provisions of this paragraph shall expressly survive the Closing or any earlier termination of this Agreement.

(d) In construing this Agreement, the singular shall be held to include the plural, the plural shall include the singular, the use of any gender shall include every other and all genders, and captions and paragraph headings shall be disregarded. The provisions of this paragraph shall expressly survive the Closing or any earlier termination of this Agreement.

(e) All of the exhibits attached to this Agreement are incorporated in, and made a part of, this Agreement.

(f) Time shall be of the essence for each and every provision hereof.

(g) This Agreement constitutes the entire agreement between the parties hereto and there are no other agreements, representations or warranties other than as set forth herein. This Agreement may not be changed, altered or modified except by an instrument in writing signed by the party against whom enforcement of such change would be sought. This Agreement shall be binding upon the parties hereto and their respective successors and assigns.

(h) Failure of either party hereto at any time to require performance of any provision of this Agreement shall not limit that party's right to enforce the provision, nor shall any waiver of any breach of any provision be a waiver of any succeeding breach of any provision or a waiver of the provision itself or any other provision.

(i) This Agreement may be executed in several counterparts and all so executed shall constitute one Agreement, binding on all the parties hereto even though all the parties are not signatories to the original or the same counterpart. Facsimile and other electronic signatures on this Agreement or any counterpart hereof shall be treated as original signatures for all intents and purposes.

[THE REMAINDER OF THIS PAGE HAS BEEN LEFT BLANK INTENTIONALLY. ALL SIGNATURES APPEAR ON THE FOLLOWING PAGE.]

**EXECUTED** by the undersigned Seller and Purchaser as of the Effective Date first above written.

**SELLER:**

PALM BEACH RESORT AND BEACH CLUB
CONDOMINIUM ASSOCIATION, INC., a Florida
not-for-profit corporation

By:

Print Name: DONALD MLAING

Title: PRESIDENT

**PURCHASER:**

COPPERLINE PARTNERS, LLC, a Florida limited liability company

By:

Print Name: RICHARN SCHLESINGER

Title: MANAGING DIRECTOR

17

## EXHIBIT A

### Legal Description

All of the underlying lands of The Palm Beach Resort and Beach Club Condominium, a Condominium according to the Declaration of Condominium thereof, recorded in Official Records Book 3464, Page(s) 1474, of the Public Records of Palm Beach County, Florida, and any amendments thereto, together with its undivided share in the common elements. Being described as follows:

A parcel of land in Section 26, Township 44 South, Range 43 East, Town of Palm Beach, Palm Beach County, Florida, more particularly described as follows:

Commencing at the intersection of the Westerly right of way line of State Road A1A and the Northerly line, or the Westerly extension thereof, of a parcel of land described as "The North 100 feet of the South 898.77 feet of Government Lot 1, Section 26, Township 44 South, Range 43 East", run Westerly along the Westerly projection of said Northerly line of said "North 100 feet of the South 898.77 feet of Government Lot 1", a distance of 594.80 feet, more or less, to a point in the Westerly boundary of land conveyed to Murry-Gernon, Inc., by the Trustees of the Internal Improvement Fund of the State of Florida by deed recorded in Official Records Book 867, Page 851; thence run Southerly at right angles to the preceding course and along said Westerly boundary of said land conveyed by the Trustees as aforesaid a distance of 100.00 feet to a point of intersection with the Westerly extension of the above described Southerly line of said "North 100 feet of the South 898.77 feet of Government Lot 1"; thence run Easterly along the Westerly extension of said Southerly line of said North 100 feet of the South 898.77 feet of Government Lot 1" a distance of 620.72 feet, more or less, to the Westerly Right of Way line of State Road A1A; thence run Northerly along the Westerly Right of Way of State Road A1A to the Point of Beginning.

LESS AND EXCEPT the following described property:

Beginning at a point in the Westerly Right of Way line of State Road A1A as the same now exists, where the Westerly extension of the North boundary of the North 100 feet of the South 898.77 feet of Government Lot 1, Section 26, Township 44 South, Range 43 East intersects said Westerly Right of Way line of State Road A1A; thence proceed Westerly along said Westerly extension of said line 100 feet to a point; thence Southerly at right angles a distance of 100 feet to a point in the Westerly extension of the South boundary line of said North 100 feet of the South 898.77 feet of Government Lot 1, Section 26, Township 44 South, Range 43 East; thence Easterly along said line a distance of 125.92 feet to the point where said line intersects the Westerly Right of Way line of said State Road A1A; thence Northwesterly along the Westerly Right of Way line of State Road A1A to the Point of Beginning; said land being located in Palm Beach County, Florida.

18

## EXHIBIT B

### Special Exceptions (subject to modifications once final title commitment is issued)

1. Defects, liens, encumbrances, adverse claims or other matters, if any, created, first appearing in the public records or attaching subsequent to the effective date hereof but prior to the date the proposed insured acquires for value of record the estate or interest or mortgage thereon covered by this form.

2. Taxes and assessments for the year 2021 and subsequent years, which are not yet due and payable.

3. Standard Exceptions:

   A. Any encroachment, encumbrance, violation, variation, or adverse circumstance affecting the Title that would be disclosed by an accurate and complete land survey of the Land.

   B. Rights or claims of parties in possession not shown by the public records.

   C. Any lien, or right to a lien, for services, labor, or materials heretofore or hereafter furnished, imposed by law and not shown by the public records.

   D. Taxes or assessments which are not shown as existing liens in the public records.

4. Any claim that any portion of the insured land is sovereign lands of the State of Florida, including submerged, filled or artificially exposed lands accreted to such land.

5. Any lien provided by County Ordinance or by Chapter 159, Florida Statutes, in favor of any city, town, village or port authority for unpaid service charges for service by any water, sewer or gas system supplying the insured land.

6. Right of way of State Road A-1-A as laid out and in use and as shown or described in Road Plat Book 1, Page 84 and Road Plat Book 1, Page 152; Easement to State Road Department of Florida recorded in Deed Book 939, Page 89; Easement to County of Palm Beach County, Florida recorded in Deed Book 942, Page 492; Easement to State of Florida recorded in Deed Book 950, Page 267.
   NOTE: Additional right of way may have been taken pursuant to F.S. 95.361.

7. Oil, gas and mineral reservations in favor of The Trustees of the Internal Improvement Fund of the State of Florida as contained in that certain Deed No. 19794, recorded in Deed Book 949, Page 31, as affected by Quit Claim Deed No. 19794-A recorded in Official Records Book 3701, Page 1004. The right of entry for mining, drilling and exploration has been released pursuant to section 270.11(3), Florida Statutes.

8. Oil, gas and mineral reservations in favor of The Trustees of the Internal Improvement Fund of the State of Florida, as contained in that certain Deed No. 23157 (725-50), dated August 10, 1962, recorded February 14, 1963, recorded in Official Records Book 867, Page 851, as affected by Quit Claim Deed 23157 (725-50)-A recorded in Official Records Book 1076, Page 25 and Quit Claim Deed 23157 (725-50)-B recorded in Official Records Book 3718, Page 328. The right of entry for mining, drilling and exploration has been released pursuant to section 270.11(3), Florida Statutes.

9. Bulkhead Line established by the Town of Palm Beach on May 13, 1953 by Ordinance No. 12-53.

10. Right of Way of Ocean Boulevard as shown or described in Deeds recorded in Deed Book 458, Page 344, Deed Book 484, Page 411, as affected by Disclaimer of State of Florida, recorded in Official Records Book 1682, Page 1048 and Quit Claim Deed from the State of Florida to Palm Beach County, recorded in Official Records Book 7107, Page 683 and in Official Records Book 8645, Page 971, and as shown in Road Plat Book 4, Page 171.

11. Easement(s) granted to Florida Power & Light Company, recorded March 11, 1960 recorded in Official Records Book 480, Page 12.

12. Easement(s) granted to Florida Public Utilities Company, recorded February 12, 1971 in Official Records Book 1874, Page 185, of the Public Records of Palm Beach County, Florida.

13. Grant of Easements in favor of United States of America recorded in Deed Book 653, Page 408.

14. Underground Easement (Business) to Florida Power & Light Company recorded in Official Records Book 29870, Page 1779.

15. Terms, covenants, conditions, easements, restrictions, reservations and other provisions, including provisions which provide for a private charge or assessment, and also provide for an option to purchase, a right of first refusal, or the prior approval of a future purchaser or occupant, according to that certain Declaration of Condominium, and the exhibits and attachments thereto, Declaration of Condominium of Palm Beach Resort and Beach Club Condominium, in Official Records Book 3464, page 1474, as amended by Amendment of Declaration Condominium as recorded in Official Records Book 3676, page 486, as amended by Certificate of Amendment to Declaration of Condominium recorded in Official Records Book 4890, page 1133, and as amended by Amendment of Declaration of Condominium as recorded Official Records Book 5357, page 1554, as may be further amended.

16. Any and all rights of the United States of America over artificially filled lands in what were formerly navigable waters, arising by reason of the United States of America's control over navigable waters in the interest of navigation and commerce, and any conditions contained in any permit authorizing the filling in of such areas.

17. The inalienable rights of the public to use the navigable waters covering the lands described on Schedule A.

18. Notwithstanding the legal description in Schedule A, this Policy does not insure title to any lands lying below the mean or ordinary high water line of any navigable or tidally influenced waters.

19. Rights of upper and lower stream owners in and to the use of the waters of Lake Worth and Intracoastal Waterway and to the continued uninterrupted flow thereof.

20. The nature, extent or existence of riparian rights or littoral rights is not insured.

21. Rights of the State of Florida or any of its agencies and the United States of America to regulate the use of that portion of the land that is submerged.

22. Rights of tenants occupying all or part of the insured land under unrecorded leases or rental agreements.

## EXHIBIT C

### List of Contracts

1. Management Contract by and between Association and Lemon Juice (may be terminated on Closing Date)
2. Dorma Kaba subscription (internet access for lock maker)
3. Comcast Business Class Hospitality Service Order Agreement dated December 17, 2015

21

## EXHIBIT D

### Initial Deliveries

The following documents, items, materials, information and/or other data affecting or pertaining to the Property or any portion thereof (to the extent that Seller has such documents, items, materials, information and/or other data in its possession):

Real Estate Tax Bills for prior 2 years and proof of payment

List of all Major Repairs made since 1/1/2018

Warranties and Guarantees (such as roof or mechanical systems)

Zoning Letters, Permits, Licenses and Approvals

Certificates of Occupancy

Appraisal Reports

Records from last 3 years showing payment of all applicable sales and tourist development taxes as to occupancy

22

# FIRST AMENDMENT TO
# PURCHASE AND SALE AGREEMENT

**THIS FIRST AMENDMENT TO PURCHASE AND SALE AGREEMENT** (this "**Amendment**") is made as of the Amendment Date, defined below, by **PALM BEACH RESORT AND BEACH CLUB CONDOMINIUM ASSOCIATION, INC.**, a Florida not-for-profit corporation ("**Seller**"), and **COPPERLINE PARTNERS, LLC**, a Florida limited liability company ("**Purchaser**").

## RECITALS:

A.    Purchaser and Seller entered a Purchase and Sale Agreement dated May 14, 2021 (the "**Agreement**").

B.    Purchaser and Seller desire to amend the Agreement as set forth herein.

**NOW, THEREFORE**, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereby agree as follows:

1.    <u>Recitals; Defined Terms</u>.  The foregoing recitals are correct and are incorporated herein.  Capitalized terms not otherwise defined herein shall have the meanings set forth in the Agreement.  The "**Amendment Date**" shall be the date on which the later of Purchaser and Seller has executed this Amendment and so notified the other in writing.

2.    <u>Title Cancellation Date</u>.  Section 4(h) of the Agreement is amended to provide that, subject to the terms of the Agreement, the "**Title Cancellation Date**" is hereby extended to July 21, 2021.

3.    <u>Effect of this Amendment</u>.  Except as expressly modified in this Amendment, the Agreement will continue in full force and effect according to its terms, and the parties hereby ratify and affirm all of their respective rights and obligations under the Agreement.

4.    <u>Counterparts; Electronic Signatures</u>.  This Amendment may be executed in several counterparts, each of which shall be an original, but all of which together shall constitute one and the same instrument.  Electronic signatures on this Amendment shall be valid and enforceable to the same extent as original signatures.

[signatures follow]

1

**IN WITNESS WHEREOF**, the parties have signed and delivered this Amendment, effective as of the Amendment Date.

<u>**SELLER**</u>:

**PALM BEACH RESORT AND BEACH CLUB CONDOMINIUM ASSOCIATION, INC.**, a Florida not-for-profit corporation

By: _[signature]_
Name: DONALD M LAVIGNE JR
Title: PRESIDENT
Date: 07/12/2021

<u>**PURCHASER**</u>:

**COPPERLINE PARTNERS, LLC**, a Florida limited liability company

By: _[signature]_
Name: RICHARD SCHLESINGER
Title: MANAGING DIRECTOR
Date: 7/13/21

*ACTIVE 56173981v1*

2

## SECOND AMENDMENT TO
## PURCHASE AND SALE AGREEMENT

**THIS SECOND AMENDMENT TO PURCHASE AND SALE AGREEMENT** (this "**Amendment**") is made as of July 22, 2021, by **PALM BEACH RESORT AND BEACH CLUB CONDOMINIUM ASSOCIATION, INC.**, a Florida not-for-profit corporation ("**Seller**"), and **COPPERLINE PARTNERS, LLC**, a Florida limited liability company ("**Purchaser**").

## RECITALS:

A.     Purchaser and Seller entered a Purchase and Sale Agreement dated May 14, 2021, as amended by First Amendment to Purchase and Sale Agreement dated July 13, 2021 (collectively, the "**Agreement**").

B.     Purchaser and Seller desire to further amend the Agreement as set forth herein.

**NOW, THEREFORE**, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereby agree as follows:

1.     <u>Recitals; Defined Terms</u>.  The foregoing recitals are correct and are incorporated herein.  Capitalized terms not otherwise defined herein shall have the meanings set forth in the Agreement.

2.     <u>Title Cancellation Date</u>.  Section 4(h) of the Agreement is amended to provide that, subject to the terms of the Agreement, the "**Title Cancellation Date**" is hereby extended to August 5, 2021.

3.     <u>Notices</u>.  Section 18 of the Agreement is amended so that Notices shall be deemed to have been given if delivered by e-mail to the following e-mail addresses (or to such other e-mail address a party to the Agreement shall have specified most recently by Notice given to the other party in the manner required under Section 18 of the Agreement, as amended by this Amendment):

If to Seller at: scott.macgregor@lemonjuice.biz

With a copy to: astivelman@eisingerlaw.com

If to Purchaser at: rschlesinger@copperlinepartners.com

With a copy to: LaymanD@gtlaw.com

Notices delivered by e-mail shall be deemed given/delivered/received on the date of transmission.

1

4.    Effect of this Amendment.  Except as expressly modified in this Amendment, the Agreement will continue in full force and effect according to its terms, and the parties hereby ratify and affirm all of their respective rights and obligations under the Agreement.

5.    Counterparts; Electronic Signatures.  This Amendment may be executed in several counterparts, each of which shall be an original, but all of which together shall constitute one and the same instrument.  Electronic signatures on this Amendment shall be valid and enforceable to the same extent as original signatures.

[signatures follow]

**IN WITNESS WHEREOF**, the parties have signed and delivered this Amendment, effective as of the date first set forth above.

<u>**SELLER**</u>:

**PALM BEACH RESORT AND BEACH CLUB CONDOMINIUM ASSOCIATION, INC.**, a Florida not-for-profit corporation

By: _____
Name: Donald Laing
Title: President

<u>**PURCHASER**</u>:

**COPPERLINE PARTNERS, LLC**, a Florida limited liability company

By: _____
Name: RICHARD SCHLESINGER
Title: MANAGING DIRECTOR

*ACTIVE 56173981v1*

3

# 58931115_v 1_Palm Beach Resort & Beach Club - Second Amendment to PSA

Final Audit Report                                                      2021-07-22

| | |
|---|---|
| Created: | 2021-07-22 |
| By: | Joshua Cole (jcole@eisingerlaw.com) |
| Status: | Signed |
| Transaction ID: | CBJCHBCAABAA0bltbVvKydlXa7u7zoHaXFNzqc5hoptu |

## "58931115_v 1_Palm Beach Resort & Beach Club - Second Amendment to PSA" History

⊡ Document created by Joshua Cole (jcole@eisingerlaw.com)
2021-07-22 - 2:35:47 PM GMT- IP address: 73.46.221.13

⊡ Document emailed to Donald Laing Jr (donniedom@aol.com) for signature
2021-07-22 - 2:36:41 PM GMT

⊡ Email viewed by Donald Laing Jr (donniedom@aol.com)
2021-07-22 - 6:49:54 PM GMT- IP address: 174.196.205.217

⊘ Document e-signed by Donald Laing Jr (donniedom@aol.com)
Signature Date: 2021-07-22 - 6:53:15 PM GMT - Time Source: server- IP address: 174.196.205.217

⊛ Agreement completed.
2021-07-22 - 6:53:15 PM GMT

 Adobe Sign

## THIRD AMENDMENT TO
## PURCHASE AND SALE AGREEMENT

**THIS THIRD AMENDMENT TO PURCHASE AND SALE AGREEMENT** (this "**Amendment**") is made as of August 5, 2021, by **PALM BEACH RESORT AND BEACH CLUB CONDOMINIUM ASSOCIATION, INC.**, a Florida not-for-profit corporation ("**Seller**"), and **COPPERLINE PARTNERS, LLC,** a Florida limited liability company ("**Purchaser**").

### RECITALS:

A.    Purchaser and Seller entered a Purchase and Sale Agreement dated May 14, 2021, as amended by First Amendment to Purchase and Sale Agreement dated July 13, 2021, and also amended by Second Amendment to Purchase and Sale Agreement dated July 22, 2021 (collectively, the "**Agreement**").

B.    Purchaser and Seller desire to further amend the Agreement as set forth herein.

**NOW, THEREFORE,** for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereby agree as follows:

1.    Recitals; Defined Terms.  The foregoing recitals are correct and are incorporated herein.  Capitalized terms not otherwise defined herein shall have the meanings set forth in the Agreement.

2.    Title Cancellation Date.  Section 4(h) of the Agreement is amended to provide that, subject to the terms of the Agreement, the "**Title Cancellation Date**" is hereby extended to August 19, 2021.

3.    Closing Costs.

Section 13(a) of the Agreement is amended to add new subsection (v) as follows: And further, (v) the total cost of any easement secured by Seller but paid before Closing by Purchaser from The Palmbeacher Apartments, Inc. (the "Palmbeacher"), including such attorneys' fees and costs incurred by the Palmbeacher provided, however, that Purchaser shall receive a credit from Seller at Closing equal to the total cost paid to the Palmbeacher less TWO THOUSAND FIVE HUNDRED AND NO/100 DOLLARS ($2,500.00).

Section 13(b) of the Agreement is amended to add new subsection (iv) as follows: And further, (iv) as a credit at Closing to Purchaser, the total cost of any easement secured by Seller and paid by Purchaser to The Palmbeacher Apartments, Inc. (the "Palmbeacher"), including such attorneys' fees and costs incurred by the Palmbeacher less TWO THOUSAND FIVE HUNDRED AND NO/100 DOLLARS ($2,500.00).

Notwithstanding anything to the contrary in Section 13(a) and (b), Seller's credit at Closing referenced herein is subject to approval by a U.S. Bankruptcy Court under 11 U.S. Code § 363, but should either (i) such approval not be granted; or (ii) the Agreement be terminated for any

reason other than Purchaser default, Seller shall reimburse Purchaser the full amount paid by Purchaser under the provisions of Section 13(a)(v).

4.      Effect of this Amendment.  Except as expressly modified in this Amendment, the Agreement will continue in full force and effect according to its terms, and the parties hereby ratify and affirm all of their respective rights and obligations under the Agreement.

5.      Counterparts; Electronic Signatures.  This Amendment may be executed in several counterparts, each of which shall be an original, but all of which together shall constitute one and the same instrument.  Electronic signatures on this Amendment shall be valid and enforceable to the same extent as original signatures.

[signatures follow]

**IN WITNESS WHEREOF**, the parties have signed and delivered this Amendment, effective as of the date first set forth above.

<u>**SELLER**</u>:

**PALM BEACH RESORT AND BEACH CLUB CONDOMINIUM ASSOCIATION, INC.**, a Florida not-for-profit corporation

By: _Donald M Laing Jr_

Name:   Donald M Laing Jr

Title:   President

<u>**PURCHASER**</u>:

**COPPERLINE PARTNERS, LLC**, a Florida limited liability company

By: _____

Name:   RICHARD SCHLESINGER

Title:   MANAGING DIRECTOR

3

# 2021.08.05 Palm Beach Resort & Beach Club - Third Amendment to PSA v2

Final Audit Report                                                        2021-08-05

| | |
|---|---|
| Created: | 2021-08-05 |
| By: | Joshua Cole (jcole@eisingerlaw.com) |
| Status: | Signed |
| Transaction ID: | CBJCHBCAABAAkVrqJBcmoPK1VS-5EpbErUbud6Dvlfvd |

## "2021.08.05 Palm Beach Resort & Beach Club - Third Amendment to PSA v2" History

📄 Document created by Joshua Cole (jcole@eisingerlaw.com)
   2021-08-05 - 7:03:59 PM GMT- IP address: 64.40.130.180

📧 Document emailed to Donald M Laing Jr (donniedom@aol.com) for signature
   2021-08-05 - 7:04:45 PM GMT

📄 Email viewed by Donald M Laing Jr (donniedom@aol.com)
   2021-08-05 - 7:25:56 PM GMT- IP address: 209.73.183.18

✍️ Document e-signed by Donald M Laing Jr (donniedom@aol.com)
   Signature Date: 2021-08-05 - 7:27:25 PM GMT - Time Source: server- IP address: 24.151.128.7

✔️ Agreement completed.
   2021-08-05 - 7:27:25 PM GMT

📕 **Adobe Sign**

## FOURTH AMENDMENT TO
## PURCHASE AND SALE AGREEMENT

**THIS FOURTH AMENDMENT TO PURCHASE AND SALE AGREEMENT** (this "**Amendment**") is made as of August 18, 2021, by **PALM BEACH RESORT AND BEACH CLUB CONDOMINIUM ASSOCIATION, INC.**, a Florida not-for-profit corporation ("**Seller**"), and **COPPERLINE PARTNERS, LLC**, a Florida limited liability company ("**Purchaser**").

### RECITALS:

A.      Purchaser and Seller entered a Purchase and Sale Agreement dated May 14, 2021, as amended by First Amendment to Purchase and Sale Agreement dated July 13, 2021, and amended by Second Amendment to Purchase and Sale Agreement dated July 22, 2021, and also amended by Third Amendment to Purchase and Sale Agreement dated August 5, 2021 (collectively, the "**Agreement**").

B.      Purchaser and Seller desire to further amend the Agreement as set forth herein.

**NOW, THEREFORE**, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereby agree as follows:

1.      Recitals; Defined Terms.  The foregoing recitals are correct and are incorporated herein.  Capitalized terms not otherwise defined herein shall have the meanings set forth in the Agreement.

2.      Title Cancellation Date. Section 4(h) of the Agreement is amended to provide that, subject to the terms of the Agreement, the "**Title Cancellation Date**" is hereby extended to Thursday, September 2, 2021.

3.      Effect of this Amendment.  Except as expressly modified in this Amendment, the Agreement will continue in full force and effect according to its terms, and the parties hereby ratify and affirm all of their respective rights and obligations under the Agreement.

4.      Counterparts; Electronic Signatures.  This Amendment may be executed in several counterparts, each of which shall be an original, but all of which together shall constitute one and the same instrument.  Electronic signatures on this Amendment shall be valid and enforceable to the same extent as original signatures.

[signatures follow]

1

**IN WITNESS WHEREOF**, the parties have signed and delivered this Amendment, effective as of the date first set forth above.

**SELLER**:

**PALM BEACH RESORT AND BEACH CLUB CONDOMINIUM ASSOCIATION, INC.**, a Florida not-for-profit corporation

By:
Name:  Donald M Laing Jr
Title:  President

**PURCHASER**:

**COPPERLINE PARTNERS, LLC**, a Florida limited liability company

By:
Name:        Adam Schlesinger
Title:        Authorized agent

# 2021.08.18 Palm Beach Resort Beach Club - Fourth Amendment to PSA

Final Audit Report                                                    2021-08-18

| | |
|---|---|
| Created: | 2021-08-18 |
| By: | Joshua Cole (jcole@eisingerlaw.com) |
| Status: | Signed |
| Transaction ID: | CBJCHBCAABAA-XxZ9f5mCyuqh5R-ockIGk8SCkKi1iBK |

## "2021.08.18 Palm Beach Resort  Beach Club - Fourth Amendment to PSA" History

🗂 Document created by Joshua Cole (jcole@eisingerlaw.com)
2021-08-18 - 4:18:26 PM GMT- IP address: 64.40.130.180

📧 Document emailed to Donald M Laing Jr (donniedom@aol.com) for signature
2021-08-18 - 4:18:47 PM GMT

📭 Email viewed by Donald M Laing Jr (donniedom@aol.com)
2021-08-18 - 4:23:14 PM GMT- IP address: 209.73.183.19

✍ Document e-signed by Donald M Laing Jr (donniedom@aol.com)
Signature Date: 2021-08-18 - 4:24:50 PM GMT - Time Source: server- IP address: 24.151.128.7

⊘ Agreement completed.
2021-08-18 - 4:24:50 PM GMT

**Adobe Sign**

## FIFTH AMENDMENT TO
## PURCHASE AND SALE AGREEMENT

**THIS FIFTH AMENDMENT TO PURCHASE AND SALE AGREEMENT** (this "**Amendment**") is made as of September 1, 2021, by **PALM BEACH RESORT AND BEACH CLUB CONDOMINIUM ASSOCIATION, INC.,** a Florida not-for-profit corporation ("**Seller**"), and **COPPERLINE PARTNERS, LLC,** a Florida limited liability company ("**Purchaser**").

### RECITALS:

A.    Purchaser and Seller entered a Purchase and Sale Agreement dated May 14, 2021, as amended by First Amendment to Purchase and Sale Agreement dated July 13, 2021, and amended by Second Amendment to Purchase and Sale Agreement dated July 22, 2021, and amended by Third Amendment to Purchase and Sale Agreement dated August 5, 2021 and also amended by Fourth Amendment to Purchase and Sale Agreement dated August 18, 2021 (collectively, the "**Agreement**").

B.    Purchaser and Seller desire to further amend the Agreement as set forth herein.

**NOW, THEREFORE,** for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereby agree as follows:

1.    Recitals; Defined Terms.  The foregoing recitals are correct and are incorporated herein.  Capitalized terms not otherwise defined herein shall have the meanings set forth in the Agreement.

2.    Title Cancellation Date.  Section 4(h) of the Agreement is amended to provide that, subject to the terms of the Agreement, the "**Title Cancellation Date**" is hereby extended to Thursday, September 9, 2021.

3.    Effect of this Amendment.  Except as expressly modified in this Amendment, the Agreement will continue in full force and effect according to its terms, and the parties hereby ratify and affirm all of their respective rights and obligations under the Agreement.

4.    Counterparts; Electronic Signatures.  This Amendment may be executed in several counterparts, each of which shall be an original, but all of which together shall constitute one and the same instrument.  Electronic signatures on this Amendment shall be valid and enforceable to the same extent as original signatures.

[signatures follow]

1

**IN WITNESS WHEREOF**, the parties have signed and delivered this Amendment, effective as of the date first set forth above.

**SELLER**:

**PALM BEACH RESORT AND BEACH CLUB CONDOMINIUM ASSOCIATION, INC.**, a Florida not-for-profit corporation

By: _____

Name: Donald M Laing Jr

Title: President

**PURCHASER**:

**COPPERLINE PARTNERS, LLC**, a Florida limited liability company

By: _____

Name: RICHARD SCHLESINGER

Title: MANAGING DIRECTOR

2

# 2021.08.31 Palm Beach Resort Beach Club - Fifth Amendment to PSA.v2

Final Audit Report                                                          2021-09-02

| | |
|---|---|
| Created: | 2021-09-01 |
| By: | Joshua Cole (jcole@eisingerlaw.com) |
| Status: | Signed |
| Transaction ID: | CBJCHBCAABAA6990mHOd9oqWDzBW6Qu23qgMKPr8068B |

## "2021.08.31 Palm Beach Resort  Beach Club - Fifth Amendment to PSA.v2" History

📄 Document created by Joshua Cole (jcole@eisingerlaw.com)
2021-09-01 - 5:53:39 PM GMT- IP address: 64.40.130.180

📧 Document emailed to Donald M Laing Jr (donniedom@aol.com) for signature
2021-09-01 - 5:54:15 PM GMT

📨 Email viewed by Donald M Laing Jr (donniedom@aol.com)
2021-09-02 - 3:25:13 AM GMT- IP address: 174.84.25.221

✍️ Document e-signed by Donald M Laing Jr (donniedom@aol.com)
Signature Date: 2021-09-02 - 3:27:47 AM GMT - Time Source: server- IP address: 174.84.25.221

✅ Agreement completed.
2021-09-02 - 3:27:47 AM GMT

**Adobe Sign**

### SIXTH AMENDMENT TO
### PURCHASE AND SALE AGREEMENT

**THIS SIXTH AMENDMENT TO PURCHASE AND SALE AGREEMENT** (this "**Amendment**") is made as of December 27  2021, by **PALM BEACH RESORT AND BEACH CLUB CONDOMINIUM ASSOCIATION, INC.**, a Florida not-for-profit corporation ("**Seller**"), and **COPPERLINE PARTNERS, LLC**, a Florida limited liability company ("**Purchaser**").

### RECITALS:

A.      Purchaser and Seller entered a Purchase and Sale Agreement dated May 14, 2021, as amended by First Amendment to Purchase and Sale Agreement dated July 13, 2021, and amended by Second Amendment to Purchase and Sale Agreement dated July 22, 2021, and amended by Third Amendment to Purchase and Sale Agreement dated August 5, 2021, also amended by Fourth Amendment to Purchase and Sale Agreement dated August 18, 2021, and amended by the Fifth Amendment to Purchase and Sale Agreement dated September 1, 2021 (collectively, the "**Agreement**").

B.      Purchaser and Seller desire to further amend the Agreement as set forth herein.

**NOW, THEREFORE,** for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereby agree as follows:

1.      Recitals; Defined Terms.  The foregoing recitals are correct and are incorporated herein.  Capitalized terms not otherwise defined herein shall have the meanings set forth in the Agreement.

2.      Title Company and Title Agent.  Section 4(h) of the Agreement is amended to provide that AMTRUST TITLE INSURANCE COMPANY shall be the Title Company and TIAGO NATIONAL TITLE, LLC shall act as the agent for the Title Company.

3.      Effect of this Amendment.  Except as expressly modified in this Amendment, the Agreement will continue in full force and effect according to its terms, and the parties hereby ratify and affirm all of their respective rights and obligations under the Agreement.

4.      Counterparts; Electronic Signatures.  This Amendment may be executed in several counterparts, each of which shall be an original, but all of which together shall constitute one and the same instrument.  Electronic signatures on this Amendment shall be valid and enforceable to the same extent as original signatures.

[signatures follow]

1

**IN WITNESS WHEREOF**, the parties have signed and delivered this Amendment, effective as of the date first set forth above.

**SELLER**:

**PALM BEACH RESORT AND BEACH CLUB CONDOMINIUM ASSOCIATION, INC.**, a Florida not-for-profit corporation

By: _____

Name:  Donald M Laing Jr

Title:  President

**PURCHASER**:

**COPPERLINE PARTNERS, LLC**, a Florida limited liability company

By: _____

Name:  RICHARD SCHLESINGER

Title:  MANAGING MEMBER

2

# 2021.12.31 Palm Beach Resort Beach Club - Sixth Amendment to PSA.v2

Final Audit Report                                                    2021-12-27

| | |
|---|---|
| Created: | 2021-12-27 |
| By: | Joshua Cole (jcole@eisingerlaw.com) |
| Status: | Signed |
| Transaction ID: | CBJCHBCAABAANGubWkD7FYqkCLzBq8FoY7tujNiyY4Te |

## "2021.12.31 Palm Beach Resort Beach Club - Sixth Amendment to PSA.v2" History

📄 Document created by Joshua Cole (jcole@eisingerlaw.com)
   2021-12-27 - 7:06:36 PM GMT- IP address: 64.40.130.180

📧 Document emailed to Donald M Laing Jr (donniedom@aol.com) for signature
   2021-12-27 - 7:07:28 PM GMT

📄 Email viewed by Donald M Laing Jr (donniedom@aol.com)
   2021-12-27 - 7:19:44 PM GMT- IP address: 104.28.39.74

✍ Document e-signed by Donald M Laing Jr (donniedom@aol.com)
   Signature Date: 2021-12-27 - 7:23:44 PM GMT - Time Source: server- IP address: 68.229.70.12

✅ Agreement completed.
   2021-12-27 - 7:23:44 PM GMT

 **Adobe Sign**

**EXHIBIT "C"**
**(Proposed Order)**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
WEST PALM BEACH DIVISION
www.flsb.uscourts.gov

In re:                                                    Case No. 21-15555 -EPK

PALM BEACH RESORT AND BEACH CLUB          Chapter 11
CONDOMINIUM ASSOCIATION, INC.,

      Debtor-in-Possession.
_____/

**ORDER GRANTING MOTION FOR ENTRY OF ORDER (A) AUTHORIZING THE
PRIVATE SALE OF REAL PROPERTIES AND ANY AND ALL ASSETS LOCATED
THEREIN, PURSUANT TO 11 U.S.C. § 363, FREE AND CLEAR OF ALL LIENS,
CLAIMS, AND ENCUMBRANCES; (B) AUTHORIZING EXECUTION OF ANY AND
ALL DOCUMENTS TO EFFECTUATE CLOSING OF THE SALE; (C) AUTHORIZING
PAYMENT OF ALL EXPENSES, FEES AND COSTS ASSOCIATED WITH THE SALE
AND ANY OUTSTANDING LIABILITIES OF THE DEBTOR INCURRED POST
CONFIRMATION THROUGH CLOSING DATE; AND (D) APPROVING
<u>DISTRIBUTION PROCEDURE FOR ALL UNIT-WEEK INTERESTS CO-OWNERS</u>**

THIS MATTER came before this Court on _____ ___, 2022 at __:__

a.m./p.m. (the "Sale Hearing") upon Debtor, Palm Beach Resort and Beach Club

Condominium Association, Inc.'s (the "**Debtor**" or "**Association**") *Motion for Entry of*

*Order (A) Authorizing the Private Sale of Real Properties and Any and All Assets Located*

*Therein, Pursuant To 11 U.S.C. § 363, Free and Clear of All Liens, Claims, And Encumbrances; (B) Authorizing Execution of Any and all Documents to Effectuate Closing of The Sale; (C) Authorizing Payment of All Expenses, Fees and Costs Associated with the Sale and Any Outstanding Liabilities of The Debtor Incurred Post Confirmation through Closing Date; and (D) Approving Distribution Procedure for All Unit-Week Interests Co-Owners* [ECF # __ ] (the "**Motion**"), seeking entry of an order: (a) directing the Debtor to timely perform its obligations under the Purchase and Sale Agreement, as amended and restated (collectively, the "**Agreement**"), by and between the Debtor and Copperline Partners, LLC, a Florida Limited Liability Company  (the "**Purchaser**"), and attached as Exhibit "B" to the Motion; (b) authorizing the private sale of all the Property, other than Excluded Property, as defined in Section 1 of the Agreement, free and clear of all liens, claims, encumbrances, and other interests (the "**Sale**") to the Purchaser; (c) authorizing the Debtor to execute any and all documents to effectuate closing of the Sale; (d) authorizing payment of all fees and costs associated with the Sale and any outstanding liabilities of the Debtor incurred post-confirmation through closing date; (e) approving distribution procedure for all unit-week interests co-owners; and (f) granting related relief set forth in the Motion. The Court having considered the Motion, the Court file, and the representations and arguments of counsel, and for the reasons stated on the record, finds good cause to grant the Motion.  Accordingly, after due deliberation, the Court –

    **FINDS AND DETERMINES THAT:**

**<u>JURISDICTION AND VENUE</u>**

    A.    This Court has jurisdiction over the Motion and the relief requested therein pursuant to 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding pursuant to 28

2

U.S.C. § 157(b)(2)(A) and (N). Venue of this case and the Motion in this district is proper under 28 U.S.C. §§ 1408 and 1409.

<u>**THE PURCHASE AND SALE AGREEMENT**</u>

B.      Prior to the Petition Date, the Debtor and the Purchaser executed the Agreement under which the Debtor would sell and the Purchaser would purchase the Property as defined in Section 1 of the Agreement, including: (a) all Condominium Units (the "**Units**") of The Palm Beach Resort and Beach Club Condominium, according to the Declaration of Condominium thereof, as recorded in Official Records Book 3464, at Page I 4 74, of the Public Records of Palm Beach County, Florida, (as amended, the "**Declaration**"), which Declaration encumbers the real property described on Exhibit "A" attached to the Agreement, together with all Common Elements appurtenant thereto (the "**Common Elements**"; all Units and Common Elements being collectively referred to herein as the "**Land**"); (b) all improvements located on the Land, including building, structures, and other facilities (the "**Improvements**," and together with the Land as the "**Realty**"); (c) all fixtures, furnishings, equipment and items of personal property used or useful in the operation, repair and maintenance of the Realty, and situated on the Realty and owned by the Debtor, (collectively, the "**Personal Property**"; the Realty and the Personal Property are hereinafter collectively referred to as the "**Purchased Assets**").

C.      As of the Petition Date, June 4, 2021, the Debtor together with the tenant in common Unit-Week Interests Owners are the owners of all the Units[1] (including the personal property located thereon), as detailed in Exhibit "A" attached thereto the Motion.

D.      The purchase price of $9,755,000 in the Agreement is fair and reasonable,

---

[1] Capitalized term not defined herein shall have the same ascribed meaning as in the Motion.

is in the best interest of the Debtor's estate, and constitutes full and adequate consideration and reasonably equivalent value for Purchased Assets under the Bankruptcy Code, the Uniform Fraudulent Transfer Act, the Uniform Voidable Transactions Act, the Uniform Fraudulent Conveyance Act, and any other applicable law for the Purchased Assets.

## THE 363(H) ADVERSARY PROCEEDING

E.    On December 23, 2021, the Court entered Summary Final Judgment [Adv. ECF # 79], Final Judgment Pursuant to Stipulation [ECF # 81], and Default Final Judgements [Adv. ECF # 77], against all tenants in common Unit-Week interest co-owners in the Units and authorized the Sale of all co-owned tenants in common Unit-Week interests, as well as apply to the co-owners' interest the associated fees and costs of the transaction, pursuant to Bankruptcy Code Section 363(h). Accordingly, the Debtor is authorized to sell all the Units, which include the Land and the Common Elements.

## PLAN CONFIRMATION

F.    On November 17, 2021, the Court entered the Order Confirming the Debtor's Plan of Liquidation [ECF # 97] (the "**Confirmation Order**") confirming the Debtor's Plan of Liquidation. The Debtor assumed the Agreement pursuant to the terms of the Plan [ECF # 53], as confirmed by this Court.

G.    Based on the claim analysis included in the Plan, the sum of all claims to be paid pursuant to the Plan, including all administrative expenses incurred and authorized, are significantly less that the Debtor's interest from any net proceeds.

## NOTICE

H.    Proper, timely, adequate, and sufficient notice of the Motion and the

transaction described in the Agreement has been provided to all parties entitled to receive such notice under the applicable rules and provisions of the Bankruptcy Code, including sections 363 of the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure and the orders of this Court. Such notice was, and is, good, sufficient, and appropriate under the circumstances of this Chapter 11 case and provided a fair and reasonable opportunity for parties in interest to object and be in heard with respect to the foregoing. Accordingly, no other or further notice with respect to such matters is necessary or shall be required.

I.      A reasonable opportunity to object or be heard with respect to the Agreement, Motion, and Sale Hearing has been afforded to all interested persons and entities, including, among others: (i) all parties entitled to receive notice as of the date hereof pursuant to Bankruptcy Rule 2002(a)(2); (ii) all parties whom the Debtor believes have an interest in acquiring the Purchased Assets; (iii) all entities listed on the Debtor's schedules as holding claims secured by, and all entities who recorded or filed proof(s) of claim secured by, the Property; and (iv) all entities who have recorded in the public record any lien, interest, or encumbrance in or upon the Property as of Petition Date.

## SATISFACTION OF SECTION 363

J.      The Debtor has demonstrated a sufficient basis to sell the Purchased Assets under 11 U.S.C. §§ 363(b), (f)(3), and (h), and such actions are appropriate and reasonable exercises of the Debtor's business judgment and is in the best interest of the Debtor, the estate and its creditors, as well as that of the tenant in common Unit-Week Interest co-owners. A valid business purpose exists for approval of the transactions contemplated by the Motion pursuant to section 363(b) of the Bankruptcy Code.

K.      The transfer of the Purchased Assets is a legal, valid and effective transfer

of the Purchased Assets free and clear of all liens, claims, encumbrances, and interests, notwithstanding any requirement for approval or consent by any person under the Bankruptcy Code, appliable state law, or otherwise.

L.      The Debtor may sell or otherwise transfer the Purchased Assets free and clear of all interests because, in each case, one or more of the standards set forth in 11 U.S.C. § 363(f) has been satisfied. Those holders of interests against the Debtor, its estate, or any of the Property who did not object, or who withdrew their objections, to the sale of the Property or the Motion are deemed to have consented thereto pursuant to section 11 U.S.C. § 363(f)(2). Those holders of such interests who did object, if any, fall within one or more of the other subsections of 11 U.S.C. § 363(f) and are adequately protected by the terms of this Order, including, as applicable, by having their interests, if any, attach to the proceeds of the sale attributable to the Purchased Assets in which such creditor or the Unit Owners alleges or asserts an Interest, in the same order of priority, with the same validity, force, and effect, that such creditor had against the Property immediately prior to consummation of the sale, subject to any claims and defenses the Debtor and its estate may possess with respect thereto.

M.      The Purchaser has not agreed to assume and shall not incur any of the debts, liabilities or obligations of the Debtor. The Purchaser would not have entered into the Agreement and would not consummate the Sale if the Purchased Assets were not being sold to the Purchaser pursuant to section 363(f) of the Bankruptcy Code, free and clear of (i) all liens (statutory or otherwise), claims, mortgages, deeds of trust, pledges, charges, security interests, charges, rights of first refusal, hypothecations, encumbrances, royalties, easements, leases or subleases, rights-of-way,

encroachments, restrictive covenants, restrictions on transferability or other similar restrictions, rights of offset or recoupment, subleases, leases or conditional sale arrangements, (ii) all claims as defined in section 101(5) of the Bankruptcy Code, including all rights or causes of action (whether in law or in equity), Proceedings, warranties, guarantees, indemnities, rights of recovery, setoff, recoupment, indemnity or contribution, obligations, demands, restrictions, indemnification claims or liabilities relating to any act or omission of the Selling Debtors or any other person prior to the Closing, consent rights, options, contract rights, covenants and interests of any kind or nature whatsoever (known or unknown, matured or unmatured, accrued or contingent and regardless of whether currently exercisable), whether arising prior to or subsequent to the commencement of this Chapter 11  case, and whether imposed by agreement, understanding, law, equity or otherwise, and (iii) all debts, liabilities, obligations, contractual rights and claims and labor, employment and pension claims, in each case, whether known or unknown, choate or inchoate, filed or unfiled, scheduled or unscheduled, noticed or unnoticed, recorded or unrecorded, perfected or unperfected, allowed or disallowed, contingent or non-contingent, liquidated or unliquidated, matured or un-matured, material or non-material, disputed or undisputed, whether arising prior to or subsequent to the commencement of the this Chapter 11  case, and whether imposed by agreement, understanding, law, equity or otherwise.

N.    The Purchaser is not and will not be liable to any agent, broker, person, or firm acting or purporting to act on behalf of either the Debtor or the Purchaser for any commission, broker's fee, or finder's fee respecting the Sale, including, without limitation, payment of the real estate brokerage commission in an amount equal to One Percent

(1.0%) of the Purchase Price to Share Trust, Inc. (the "**Broker Fee**").

## GOOD FAITH PURCHASER

O.      The Purchaser is not an "insider" of the Debtor, as that term is defined in 11 U.S.C. § 101(31) and the decisions thereunder.

A.      The Purchaser is a "good faith purchaser," as that term is used in the Bankruptcy Code and the decisions appurtenant thereto and is entitled to the protections in 11 U.S.C. § 363(m) with respect to the Purchased Assets and the purchase of the Purchased Assets. Neither the Debtor nor the Purchaser has engaged in any conduct that would prevent the application of 11 U.S.C. § 363(m). Specifically, the Agreement has been negotiated by the Debtor and the Purchaser in good faith, at arm's length and without collusion or fraud. The terms and conditions of the Agreement is fair and reasonable, and the Sale of the Purchased Assets pursuant to its terms is in the best interest of the Debtor, the estate and its creditors, as well as the tenants in common Unit-Week interest co-owners. The Purchaser is deemed a "good faith purchaser" entitled to the full rights, benefits, privileges, immunities and protections of 11 U.S.C. § 363(m) with respect to the Sale of the Purchased Assets.

P.      The Agreement was not entered into for the purpose of hindering, delaying, or defrauding creditors. Neither the Debtor, the Purchaser, nor any of their respective representatives have engaged in any conduct that would cause or permit the Agreement, or the consummation of the Sale, to be avoidable or avoided, or for costs or damages to be imposed, under 11 U.S.C. § 363(n), or has acted in any improper or collusive manner with any Person in connection therewith.

## NOT A SUCCESSOR

Q.    The Purchaser is not, and shall not be deemed to, as a result of any action taken in connection with the Sale: (1) be a successor to or a mere continuation or substantial continuation (or other such similarly situated party) to the Debtor or its estate; or (2) have, *de facto* or otherwise, merged or consolidated with or into the Debtor, regardless of the Purchaser's use of the Purchased Assets after consummating the Sale. The Purchaser shall not assume or in any way be responsible for any liability or obligation of any of the Debtor and/or its estate, other than to the extent expressly provided in the Agreement or in this Order.

## CORPORATE AUTHORITY

R.    The Debtor, by and through its appointed board of directors (the "**Board**") and its president have full corporate power and authority to consummate the transaction contemplated in this Order, the Agreement, and all other documents contemplated thereby. No consents or approvals, other than as expressly provided for in the Agreement, are required by the Debtor to consummate such transactions.

**NOW, THEREFORE, IT IS ORDERED, ADJUDGED AND DECREED** as follows:

1.    The Motion is **GRANTED**.

2.    Pursuant to 11 U.S.C. § 363(b) and (f)(3), the Debtor is authorized to sell and transfer the Purchased Assets to Purchase, free and clear of all liens, claims, encumbrances and interests in the Units, whether known or unknown, with all such liens, claims, encumbrances and interest attaching to the proceeds of the Sale as provided herein. As of the Closing (as defined in the Agreement), the Sale of the Purchased Assets by the Debtor (and its tenant in common Unit-Week Interest co-owners) to the Purchaser

shall constitute a legal, valid, and effective transfer of the Purchased Assets, notwithstanding any requirement for approval or consent by any person and shall vest the Purchaser with all right, title and interest in and to the Purchased Assets free and clear of all liens, claims, encumbrances, and interests, pursuant to 11 U.S.C. § 363(f)(3).  The liens, claims, and interest shall attach to the proceeds of the Sale.

3.      The Sale of the Purchased Assets to Purchaser under the Agreement will constitute a transfer for reasonably equivalent value and fair consideration under the Bankruptcy Code and all applicable law. Further, for avoidance of doubt, the Debtor, its creditors, and all tenant in common Unit-Week Interest co-owners shall be forever barred, estopped and permanently enjoined from taking any action of any kind against the Purchaser or the Purchased Assets on account of any claim against the Debtor or the Purchased Assets.  All Persons are forever prohibited and barred from taking any action that would adversely affect or interfere (a) with the ability of the Debtor to sell and transfer the Property to Purchaser in accordance with the terms of the Agreement and this Order, and (b) with the ability of the Purchaser to acquire, take possession of, use and operate the Purchased Assets in accordance with the terms of the Agreement and this Order.

4.      Notwithstanding any action taken in connection with the Sale contemplated by the Agreement, or the operation and use of the Purchased Assets acquired from the Debtor, it shall be deemed that the Purchaser (i) is not the successor of the Debtor, (ii) has not, *de facto*, or otherwise, merged with or into the Debtor, (iii) is not a mere continuation or substantial continuation of the Debtor or the enterprise(s) of the Debtor, (iv) is not a successor employer as defined in the Bankruptcy Code or under other applicable law, and (v) is not liable for any acts or omissions of the Debtor in the conduct

of the its business or arising under or related to the Property. The Purchaser shall have no successor or vicarious liability of any kind or character whether known or unknown as of the Closing, whether now existing or hereafter arising, or whether fixed or contingent, with respect to the Purchased Assets or any interests in respect of the Debtor arising prior to the Closing. Nothing in this Order shall prohibit the Purchaser from operating or otherwise using the Purchased Assets to operate a timeshare.

5.       The Debtor is **AUTHORIZED,** by and through its Board and its duly authorized officer, to execute, deliver, perform, consummate, and implement all of the terms and conditions of the Agreement, to execute any and all documents associated therewith, and to take all actions necessary or appropriate to effectuate the transactions contemplated therein. Upon and Effective of the Closing (as defined in the Agreement) on the Sale, the Debtor shall have delivered to the Company a letter of resignation for any and all directors or officers of the Debtor, including without limitation, the members of the Board and the President.

6.       The transfer of the Purchased Assets to the Purchaser pursuant to the Agreement shall not result in the Purchaser having any liability or responsibility for, or being required to satisfy in any manner, whether in law or in equity, whether by payment, setoff, or otherwise, directly or indirectly, any claim against the Debtor or against any insider of the Debtor or Interests.

7.       The Purchaser shall be entitled to the protection of the good faith purchaser for value under 11 U.S.C. § 363(m), if this Order or any authorization contained herein is reversed or modified on appeal. The Sale is not subject to avoidance pursuant to 11 U.S.C. § 363(n).

8.    Debtor is authorized to sell all associated personal property located therein the Units to the Purchaser.

9.    Upon closing, all liquid financial assets held in the Debtor's estate bank accounts, all of which have been excluded from the Sale in the Agreement and are specifically designated as additional assets of the Debtor's estate that shall be transferred to the Disbursing Agent at closing.

10.    Debtor is **AUTHORIZED** to pay all fees and costs associated with the Sale, including any broker fee as detailed in the Motion, and disburse the net sales proceeds to distribution agent, Maria Yip, pursuant to the confirmed Plan, who shall distribute the net amounts pursuant to the Plan.  Each tenant in common Unit-Week Interest co-owners shall receive their interest pursuant to the procedure outlined in the Plan and as supplemented and/or modified herein. Further, Debtor is **AUTHORIZED** to pay, by and through the Disbursing Agent, all such outstanding liabilities incurred by the Debtor post-confirmation and through closing. Such payments are in addition to any distributions to be made pursuant to the confirmed Plan and any outstanding order by this Court. The Disbursing Agent shall include such information in any reports required to be filed with the Court.

11.    In addition to the previously approved distribution process as part of the Plan, the Court **APPROVES** the following administrative process to further enhance and facilitate the distribution process to the tenant in common Unit-Week Interest co-owner:

A)    <u>Checks Payees and Address of Payee</u>: Checks issued to Unit-Week Owners by the Disbursing Agent shall be made to **all named** owners of a particular Unit-Week as appearing on the Debtor's records and on title to the Unit-Week. Checks issued to multiple owners shall be sent, via U.S. Mail or like-kind delivery method, to the primary address of record as appearing on the Debtor's books and records. In the event of multiple addresses on

12

record and/or multiple owners, the check in the name of all owners shall be sent to the address of only one of the owners who has been the **primary** responsible party for payment of Association dues/assessment in the 12-month period prior to commencement of the bankruptcy case. Primary shall mean the majority of all payments made to the Association during the foregoing period. To the extent the Disbursing Agent cannot determine an address to send the check considering multiple conflicting addresses and unclear assessment payment history, the Disbursing Agent shall exercise her business judgement in sending the payment to an address she determines.

B)      Distribution Payment to Owners of Multiple Unit-Week Ownership Interests: To the extent a single entity or person own multiple Unit-Week Interests, the Disbursing Agent, in her business judgment, may issue a single check and/or facilitate such distribution payment via electronic means rather than multiple check payments so as to save the estate the costs associated with payment of those funds.

C)      Distribution to Unit-Week Interest Owners: The Disbursing Agent shall distribute to Unit-Week Owners in two or more rounds. Prior to first round distribution, Disbursing Agent shall e-mail/mail a notice to all **primary** Unit-Week Owners of record with a request for address confirmation (the address to which payment will be sent) with a 30-day period to update payee information (to be determined pursuant to the administrative process outlined in this Motion). To the extent no response shall be received, the payee address shall be the address identified by the Disbursing Agent pursuant to the process outlined in this Motion. First, Disbursing Agent shall remit the net amount owed to any Unit-Week owner (less any sums owed to the Estate, as provided for under the Plan) for their Unit-Week Interest based on the Declaration's common elements percentage, per unit type and a 1/52 allocation. Then, the Disbursing Agent may, in her business judgment, distribute in one or more additional distributions, the Debtor's interests in Unit-Weeks together with all other sums held in reserve accounts, operating accounts, or any other account of the Estate, after accounting for fees and costs of administration of the remaining estate, and while providing for adequate sums as reserves to ensure the operation of the estate through the final distribution and closure of the Estate.

D)      Estate Distributions: To the extent any final distribution of estate funds to co-owners is determined by the Disbursing Agent in her business judgment to be de minimis so as to render the such distribution to be less than the administrative costs and fees associated with facilitating such distribution, then such funds shall be tendered to the Bankruptcy Bar Association for the Southern District of Florida, after first deducting for any remaining fees and costs incurred by the Disbursing Agent and her professionals in closing the case.

E)      Distribution to Unknown Heirs: To extent a payment is to be made to unknown heirs of a Unit-Week Interest owner, without any other co-owner on said Unit-Week, such payment shall be held by the Disbursing Agent for a period of up to 180 days, subject to demands and proof by the lawful heirs[2], after which, if no demand and adequate proof is provided, such payment shall be sent to the State of Florida Unclaimed Funds.  If a distribution payment is to be made to a known Unit-Week Interest owner and an Unknown Heir, then such payment shall be made in the name of the known Unit-Week Interest Owner party and the Unknown Heir of the other co-owner of the Unit-Week, and such payment shall be sent to the known party.

F)      Undelivered Payments: Undelivered payments shall be governed in accordance with the terms of the Plan, as confirmed.

12.     The Debtor shall be responsible for payment of Broker Free to Share Trust, Inc., which shall be paid as part of the closing costs charged to the Debtor, as authorized in paragraph 10 of this Order.

13.     Upon Closing of the Sale, the Association shall no longer be considered a debtor or debtor-in-possession in this proceeding and shall have no further duties or obligations in connection with the Chapter 11 case.  The Disbursing Agent shall continue performance of any and all obligations of the Estate.

14.     The provisions of this Sale Order are non-severable and mutually dependent.

15.     This Court retains jurisdiction, pursuant to its statutory powers under 28 U.S.C.§ 157(b), to, among other things, (i) interpret, implement, and enforce the terms and provisions of this Order, the Agreement, and any amendments thereto and any waivers and consents given thereunder, (ii) compel delivery of the Purchased Assets to the Purchaser, (iii) enforce the injunctions and limitations of liability set forth in this Order,

---

[2] Lawful Heir is an heir pursuant to probate court order or other proof of lawful transfer of ownership by a decedent.

and (iv) enter any orders under 11 U.S.C. § 363.

###

Submitted by:

Ido J. Alexander, Esq.
AlignX Law
12555 Orange Drive., Suite 4159
Davie, Florida 33330
Telephone: (954) 686-7399
E-Mail: ija@alignxlaw.com

**Copies to:**

Ido Alexander, Esq.